## GRUMMAN AEROSPACE CORPORATION

### v.

### The UNITED STATES.

### No. 410–72.

United States Court of Claims.

Feb. 23, 1977.

Henry G. Beauregard, Washington, D. C., attorney of record, for plaintiff. Raphael Mur, Robert W. Ballin, Long Island, N. Y., Stephen B. Clarkson, Thomas J. Touhey and Sullivan, Beauregard & Clarkson, Washington, D. C., of counsel.

Gerald L. Schraeder, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case comes before the court on the joint motion of the parties, filed November 17, 1976, pursuant to Rule 54(b)(3)(iii), moving that the court adopt the recommended decision of Trial Judge George Willi, filed July 19, 1976, pursuant to Rule 166(c) on the parties' cross-motions for summary judgment, as the basis for its judgment in this case. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby grants the parties' motion and adopts the said decision as the basis for its judgment in this case. Therefore, plaintiff's and defendant's motions for summary judgment are both allowed in part and denied in part (as is set forth in the trial judge's opinion) and, accordingly judgment is entered for plaintiff in the amount of $197,048.50.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge: This is a suit to review, subject to the constraints of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970), the Armed Services Board of Contract Appeals' (the Board) approval of a contracting officer's denial of reimbursement for $394,-097 that plaintiff paid a subcontractor (Hazeltine) under three fixed-price purchase orders for certain radar equipment that it used in performing a cost-plus-fixed-fee prime contract to supply the Navy with an improved type of radar-equipped, carrier-based aircraft.

On a record that consisted of a stipulation of facts with a large number of appended documentary exhibits concerning both the immediate negotiations between plaintiff and Hazeltine and their prior (and almost contemporaneous) dealings with each other on the same type equipment, the Board found that the prices called for in the three challenged purchase orders were unreasonably high and therefore confirmed the denial of reimbursement to the plaintiff. *Grumman Aerospace Corp.*, 71–1 BCA ¶ 8881.

Plaintiff then brought suit here to upset the Board's determination. Examination of the record made at the administrative level revealed that apart from the ultimate question of whether the prices paid Hazeltine were or were not too high, in fact, one of plaintiff's major contentions before the Board had been that it was due reimbursement in any event because, in accordance with established procedure, it had submitted these subcontracts (together with their underlying pricing data) to the Navy for preaward review and was entitled to assume, from the Navy's affirmative acknowledgment of such review and lack of any stated objection, that it was acting reasonably when it thereafter awarded the business to Hazeltine on the terms proposed. Since the initial Board decision did not treat with this contention and since its proper evaluation required some additional factual determinations, the cause was remanded to the Board for these purposes by the court's order of March 8, 1974, 204 Ct.Cl. 809.

In a further opinion of September 8, 1975, the Board, with one member dissenting, adhered to its earlier conclusion that plaintiff was not entitled to reimbursement of the subcontract costs in suit. *Grumman Aerospace Corp.*, 75–2 BCA ¶ 11,493.

Counsel have since filed supplemental briefs and the matter is now ripe for decision.

It is important to note at the outset that the transactions underlying this controversy occurred prior to enactment of the so-called Truth In Negotiations Act on September 10, 1962 as Pub.L. 87–653, 76 Stat. 528. Of particular pertinence here is that portion of the Act requiring, *inter alia*, a subcontractor whose contract is expected to exceed $100,000 in price to provide the head of the procuring agency with a certificate of current cost and pricing prior to award of such a contract. 10 U.S.C. § 2306(f) (1964). It

appears[1] that much of the impetus for adoption of this legislation came from investigative findings of the General Accounting Office (GAO). It is therefore not surprising to find that the denial of reimbursement that is the subject of this suit was totally precipitated by post-audit activities and the ensuing recommendations of the GAO. As will appear, the timing and character of those findings and recommendations bear relevantly on the liability determinations to be made herein.

All facts recited herein are either as expressly found by the Board or as directly set forth in the parties' comprehensive stipulation of facts filed with the Board.

Plaintiff's prime contract with the Navy, the contract under which the subject cost reimbursements were withheld, was entered into on June 15, 1956 with the Bureau of Aeronautics.

The Navy's WF–2 attack early warning aircraft was designed and developed by plaintiff. One of its features was the AN/APS–82 airborne radar system. Plaintiff contracted with Hazeltine for the development of such a system in 1956 and ordered production models of the perfected system from it in April 1958.

In November 1958 and January 1959, plaintiff issued three letter-of-intent contracts to Hazeltine as forerunners of subsequent formal purchase orders for spare parts and modification kits to support the radar systems already on order from Hazeltine. After receiving these letter contracts

1. Under the caption WHAT THE BILL DOES, the following explanatory statement appears in the identical House and Senate Reports on H.R. 5532, 87th Cong., 2d Sess. [2 U.S.Code Cong. & Ad.News, at pp. 2477–78 (1962)]:

"Requires certificate from contractors performing under negotiated contracts that cost data are current, accurate, and complete

"In determining the price under many types of negotiated contracts the Government must rely, at least in part, on cost and pricing data submitted by the contractor or his subcontractor. *In recent years the General Accounting Office submitted several reports to the Congress on cases in which contractors received unwarranted profits because the data used in establishing target costs or prices were inaccurate, incomplete, or out of date.* Although many of these reports were on incentive contracts, the objective of avoiding enhanced profits through failure to inform the contracting agency of the most current, accurate, and complete cost data is equally desirable in other types of negotiated contracts.

"While the Armed Services Procurement Regulation now contains requirements for certification of cost and pricing data, *the General Accounting Office informed the committee that its examination of major military procurement activities in the past disclosed that many noncompetitive procurements were being accomplished without obtaining certifications from Defense contractors and subcontractors.*

"Section (e) of the bill would enact a requirement that prime contractors and subcontractors must certify that to the best of their knowledge and belief the cost of pricing data they submit is current, accurate, and complete. This certificate would be required for negotiated prime contracts of more than $100,000, changes or modifications involving more than $100,000 in contracts, subcontracts of more than $100,000 if the prime contractor and each higher tier subcontractor have been required to furnish such a certificate, and changes or modifications to such subcontracts involving $100,000 or such lesser amount as may be prescribed by the head of the agency. In addition, any prime contract or any change or modification to a prime contract under which such certificate is required must contain a provision that the price to the Government shall be adjusted to exclude any significant amounts by which the head of the agency determines that the price was increased because the cost of pricing data furnished was inaccurate, incomplete, or not current. The controlling date for such determination is the date that is as close to the date of agreement on the negotiated price as is practicable.

"The only exceptions from the requirement for cost certification and adjustment provisions are where the price negotiated is based on (1) adequate price competition, (2) established catalog or market prices of commercial items sold in substantial quantities to the general public, (3) law or regulation, or (4) in exceptional cases where the head of the agency determines that the requirement may be waived and states in writing his reasons for such a determination. "The objective of these provisions is to require truth in negotiating. Although not all elements of cost are ascertainable at the time a contract is entered into, those costs that can be known should be furnished currently, accurately, and completely. If the costs that can be determined are not furnished accurately, completely, and as currently as is practicable, the Government should have the right to revise the price downward to compensate for the erroneous, incomplete, or out-of-date information." [Emphasis added.]

Hazeltine began obtaining quotations from suppliers for the material needed to produce the spares and modification kits involved and placed firm orders for sizeable quantities of such material prior to the time that the letter contracts were converted into formal purchase orders. Plaintiff had no knowledge of these activities by Hazeltine.

On January 7, 1959, Hazeltine submitted specific price proposals for converting the two letter contracts pertaining to spare parts to formal purchase orders. The total price proposed by Hazeltine for the two orders was $2,994,084.65. In the negotiations that followed, plaintiff attempted to persuade Hazeltine to accept a flexible pricing arrangement for this procurement, as it had done on the earlier development and production contracts for the same equipment. Hazeltine insisted, however, on receiving fixed-price contracts.

The background against which plaintiff conducted the above negotiations included a memorandum of October 7, 1957, that had been issued it by the Navy's Bureau of Aeronautics Representative (BAR) stationed at Bethpage, Long Island. The memorandum was entitled: "Military Purchase Orders submitted to Bureau of Aeronautics Representative for review or approval; change in procedure." Paragraphs 2 and 3 of that memorandum provided:

2. Under present procedures an affidavit justifying the award and summarizing the bid information is attached to each military order in excess of $100. Under the revised procedures, affidavits will be required only on procurements exceeding $25,000. Orders under $25,000 will be subject to BAR review on a spot check basis. The Contractor's procurement file on these latter orders should contain all the information that was formerly shown on the affidavit.

3. Two (2) BAR endorsements are placed on each military order. *It is deemed advisable for mutual reasons to mention the significance of each endorsement.* The inspection endorsement is placed on the Contractor's blue file copy. It signifies that the materials or services under procurement are considered by the

BAR to be necessary as to kind, quality and quantity in the performance of the contract and that the type of Government inspection specified on the order is correct. *The procurement endorsement is placed on the affidavit copy of the order. It signifies that the BAR has reviewed the procurement and has determined that the Contractor exercised reasonable business judgment in making the award. If insufficient or unsatisfactory procurement information is furnished or if additional time is required to complete the procurement review, the BAR will return the order to the Contractor with only the inspection endorsement.* This action will permit the Contractor to release the order to the vendor thereby preventing delays in the procurement of critical or long lead items. The affidavit copy of the order will be retained and will not be endorsed until the BAR has completed the procurement review. [Emphasis added.]

\* \* \* \* \* \*

On remand, the Board found that the above-referenced BAR memorandum applied to the purchase orders in suit. It said (75–2 BCA at 54,834):

Most certainly on its face the 7 October 1957 BAR memorandum has application to each of the purchase orders in dispute. \* \* \* An unquestioned reproduction of the BAR memorandum was stipulated into evidence and, as far as we know, its applicability to these transactions has not hitherto been challenged in the long history of these proceedings. In the absence of more substantial evidence to the contrary we find it was a viable document in 1959 when these purchase orders were issued.

Purchase Orders numbered G–49450, in the amount of $261,657, and G–56260, in the amount of $2,424,394, together with the underlying pricing data associated with them, were both submitted by plaintiff to the office of the Bureau of Aeronautics Representative prior to issuance to Hazeltine. These were the two orders for spare parts. The same procedure was subsequently fol-

lowed with respect to Purchase Order No. 64547, in the amount of $364,482, covering the modification kits. The advance submission to BAR was in accordance with the October 1957 BAR memorandum which is set forth in full in the Board's supplemental opinion. 75–2 BCA at 54,833–34. Consistent with that memorandum each of the purchase orders involved herein bore the following blanks for "inspection" and "procurement" endorsements, respectively:

```
"APPROVED FOR
INSPECTION BY
BAR BETHPA[G]E, N. Y. PER_____"
```

*        *        *        *        *

| VALUE OF THIS P. O. | □ REVIEWED |
| --- | --- |
| □ OVER | □ APPROVED ON THE BASIS OF AVAILABLE INFORMATION SUBJECT TO FURTHER INVESTIGATION AND REVIEW BY NAVY COST INSPECTION SERVICE AS TO REASONABLENESS OF PRICE. BAR BETHPAGE, N. Y. PER_____ |
| □ UNDER $25,000.00 | |

None of the inspection endorsement blanks on the purchase orders placed in evidence before the Board bear the signature or initials of BAR personnel. In the context of the BAR memorandum this omission is not significant, however, because the procurement endorsement on each of the orders was executed on behalf of the BAR. Thus, a checkmark was placed on each of the orders signifying a value in excess of $25,000 and the REVIEWED box on each of them was similarly marked. The signature line on the orders for spares, Nos. G–49450 and G–56260, was executed on behalf of the BAR by Solomon Liebowitz. On No. G–64547, the order for the modification kits, the BAR endorsement was by "HK," identified by the Board as Hank Krasienko, Mr. Liebowitz' immediate superior.

While the dates on which the BAR representatives executed the procurement endorsements do not specifically appear (neither do the specific dates on which the three orders were released to Hazeltine), the parties formally stipulated before the Board that the subject orders were not is-

sued to Hazeltine until after submission to the BAR and completion of the review conducted by that office. In this proceeding the Government has not asked to be relieved of that stipulation. The purchase orders in evidence were dated, however; No. G–49450 was dated March 27, 1959; No. G–56260 was dated April 1, 1959; and No. G–64547 was dated July 9, 1959.

The parties also stipulated before the Board that Hazeltine completed deliveries under the spare parts orders, Nos. G–49450 and G–56260, by August 1, 1960 and under the modification kit order, No. G–64547, by April 1, 1960.

As to the qualifying language on the procurement endorsements referring to " * * * FURTHER INVESTIGATION AND REVIEW BY NAVY COST INSPECTION SERVICE AS TO REASONABLENESS OF PRICE," there is no evidence in the record indicating either that prior to completion of performance of the three purchase orders and final payment by plaintiff to Hazeltine thereunder the Navy Cost Inspection Service conducted any investigation or review of those orders or, if it did, that it ever took any exception to the prices specified therein. As earlier noted, it appears that the sole impetus for the ultimate denial of reimbursements to the plaintiff in respect of those orders came from GAO. That agency's findings and recommendations were set forth in an October 1962 draft report to the Congress and in the Comptroller General's subsequent final report, B–132974, transmitted to the Congress on March 29, 1963. Both of these reports are included in the Board record.

In summary, the GAO found that the prices paid Hazeltine were excessive by more than $400,000 for three basic reasons; first, because the prices proposed for the two spare parts orders included contingency allowances totaling approximately $194,500 —allowances that were unwarranted because of actual experience already gained by Hazeltine in performing the cost-type production contracts for the operational units for which the spare parts were being obtained; second, because when Hazeltine

quoted on both the spare parts and modification kit orders it had already bought or had firm commitments to buy material components at prices some $220,000 less than it used in arriving at the prices that it quoted plaintiff; and third, because Hazeltine's quote on the modification kit order included material costs of $15,000 that related to two more kits than called for by the order.

The GAO did not intimate in either of its reports that plaintiff had any actual contemporary knowledge of the causes of Hazeltine's overpricing. Rather, the burden of its findings was on Hazeltine's nondisclosure. Thus, the draft report observed: "Had the Navy or Grumman obtained Hazeltine's most recent experienced costs or vendors' quotations before the formal purchase orders were awarded, they would have been in a sound position to negotiate a reduction in the purchase order prices of about $433,000." Moreover, GAO's comments uniformly assigned equal responsibility for what happened to both plaintiff and the Navy. That viewpoint is implicit in the statements with which GAO concluded its draft report, as follows:

*Conclusion and recommendation*

We believe that in negotiating the prices of purchase orders issued under Government cost-type contracts, current cost information, when available, should be considered by both the buyer and the seller in order that the prices they negotiate, which are borne by the Government, are fair and reasonable. From the foregoing, it seems evident that Hazeltine and Grumman failed to give proper consideration to the negotiation of prices of purchase orders G–49450, G–56260, and G–64547. It also seems evident that the Navy failed to exercise proper control over Grumman, its prime contractor, in permitting it to negotiate purchase order prices that provided for about $433,000 more cost than Hazeltine could reasonably expect to incur.

It does not seem reasonable that the Government should incur costs of $433,-000 and Hazeltine benefit by that amount because the prices negotiated by Hazeltine and Grumman for the three purchase orders did not give effect to the most current cost information available and included a provision for contingencies that was unwarranted. We therefore recommend that the Navy and Grumman take all available and appropriate action to obtain proper recovery from the Hazeltine Corporation.

We believe that this case demonstrates the need for the Navy to maintain closer surveillance over subcontract pricing. We therefore recommend that the findings in this report be brought to the attention of Navy contracting officials, including those directly responsible for reviewing contract costs, to illustrate the need for more careful review of subcontract cost to be borne by the Government.

GAO transmitted copies of its draft report to plaintiff, Hazeltine and the Navy. In response, Hazeltine took the position that the purchase order transactions were completed and closed; that there was no provision in the orders authorizing a reopening, and that it declined in any event to make any voluntary price readjustment. Plaintiff advised the Comptroller General that it knew of no means or measure by which it could compel Hazeltine to disgorge any part of the prices that it had received. It appears that the Navy's reaction to GAO's recommendation that it attempt to effect some recovery from Hazeltine was simply notification to plaintiff that the Navy was holding it responsible under its prime contract. In practice, this was what the Navy did and hence the present litigation.

The various comments received by the Comptroller General did not alter the conclusions and recommendations contained in his draft report. Thus, he adhered in his final report to the basic premise that the real villain in the piece was Hazeltine,[2] who

---

2. In his final report (B–132974) the Comptroller General stated:

" * * * it is not reasonable that Hazeltine should retain the $428,800 it acquired by seek-

was only able to reap excessive subcontract prices because of the mutual failure and/or inability of plaintiff and the Navy to sufficiently scrutinize the cost justification for the prices that it sought. The Comptroller did not suggest or imply, however, that Hazeltine had achieved its pricing objectives by resort to fraud or affirmative deceit.

That the transaction involved in the present suit was a classic illustration of the need for legislation requiring advance disclosure of the costs on which contractors' bid proposals were predicated was expressly recognized by the Comptroller General.

Under the caption *Conclusion* his final report stated:

> The new requirement [speaking of the Truth In Negotiations Act] for the furnishing of cost or pricing data should result in agency officials' obtaining the information needed for proper evaluation of prices proposed by subcontractors. If such data are properly utilized, the recurrence of situations such as those described in this report can be prevented.

> Since the Navy has informed us that it will seek an appropriate recovery from Hazeltine and that we shall be advised of the recovery made, further action on this matter by our office will be held in abeyance pending advice from the Navy on the results of its attempts to obtain recovery from Hazeltine.

Experience has shown that the Act has at least the potential to prevent what occurred here. *M–R–S Mfg. Co. v. United States,* 492 F.2d 835, 841, 203 Ct.Cl. 551, 561 (1974).

In its initial opinion (71–1 BCA ¶ 8881) the Board affirmed the contracting officer's disallowances on the stated premise that the prices contained in the three Hazeltine purchase orders were unreasonably high. The opinion reached that conclusion by basi-

cally tracking the findings of the GAO. That overcharges in at least the approximate amount perceived by the GAO occurred has never been placed in any substantial doubt. As far as it went, therefore, the Board's conclusion is unassailable. That conclusion, however, stops short of the ultimate inquiry presented by the particular circumstances of this case. The question that must be confronted is: assuming Hazeltine's retention of its windfall gains, who, as between plaintiff and the Navy,[3] should bear the financial responsibility for those unmonitored gains? To assess plaintiff's relative responsibility in the matter requires more than a bare determination that the prices it paid Hazeltine were too high. The controlling question must be whether plaintiff acted reasonably when it awarded Hazeltine contracts with prices that in the light of Hazeltine's actual knowledge were higher than they should have been. Given plaintiff's unawareness, in fact, of what Hazeltine was up to, it is on that issue that the BAR memorandum and plaintiff's advance submission of the proposed orders for BAR review become most relevant. The need for exploration of those matters necessitated the remand.

As already noted, the Board acknowledged on remand that the 1957 BAR memorandum covered the orders in suit. The memorandum specified that a procurement endorsement " * * * signifies that the BAR has reviewed the procurement and has determined that the Contractor exercised reasonable business judgment in making the award." It then goes on to state that: "If insufficient or unsatisfactory procurement information is furnished or if additional time is required to complete the procurement review, the BAR will return the order to the Contractor with only the inspection endorsement." On remand, the Board found that the three purchase orders

---

ing purchase orders on a fixed-price basis and then fail to base its price on information available on the costs it would in all likelihood incur in performing under the contract." The Comptroller did not, however, offer any suggestions as to how either plaintiff or the Navy could effectively recoup this apparent windfall from

Hazeltine. *See, e.g., United States v. Systron-Donner Corp.,* 486 F.2d 249 (9th Cir.1973).

**3.** The GAO's reports clearly reflect the view that the Navy was at least as much responsible as the plaintiff for failure to timely uncover the excessive pricing that occurred.

were returned to the plaintiff with the procurement endorsement blank on each of them completed by a checkmark in the REVIEWED box and a signature by a BAR employee in the space provided for acknowledgment of the review. The Board went on to hold, however, that these were not "procurement endorsements" within the meaning of the BAR memorandum because the endorsers, although employed as procurement analysts in the office of the BAR and having the review of purchase orders among their principal duties, were not contracting officers and were therefore without authority to formally approve purchase orders. This analysis misses the point, however. The question is not whether the individuals involved had the capacity to bind the Government to the pricing terms of the proposed orders that were submitted to them but whether they were competent to perform the review contemplated by the BAR memorandum—a review that signified no more than a tentative approval as to price subject to the express contingency of later revision by the Navy Cost Inspection Service. There is nothing in the BAR memorandum or elsewhere indicating that only a contracting officer would be deemed to have that competence. Moreover, the stated contingency never materialized; either because at no time during the period of more than a year between award of the orders to Hazeltine and its completion of performance thereunder, did the Inspection Service elect to make a follow-up audit or, if it did, because it found the terms of the orders to be satisfactory.

The board noted that poor health prevented Mr. Krasienko, who endorsed the purchase order for modification kits, from testifying in the remand proceeding. It related, however, that his subordinate, Mr. Liebowitz (who endorsed the two orders for spares) testified that: "My initials were an indication to Grumman that I had reviewed that particular purchase order, and I had no further questions on it. During that period of time, the volume was so great, the Grumman purchasing people, by seeing my initials up front, would know right away that they had no problem with that particular purchase order." The witness went on to acknowledge what was explicit in the terms of his endorsement; that he did not have authority to commit the Government to final approval of the orders.

The foregoing factors combine to impel the conclusion reached by the dissenting Board member (75–2 BCA at 54,838–39); that each of the purchase orders involved carried a procurement endorsement within the meaning of the 1957 BAR memorandum. Accordingly, were it not for the fact that when plaintiff was negotiating the spare parts orders with Hazeltine it was in midstream of a fixed-price-redeterminable production subcontract with the same supplier for the same materials, the entire amount ($394,097) of the withheld reimbursements should be awarded it because of the presumption of reasonableness arising from its compliance with the provisions of the memorandum. A negotiating vantage point reinforced by the sources of intelligence that were available to plaintiff imposed an obligation on it to subject Hazeltine's proposals to a much more informed and penetrating scrutiny than could have been expected in a first-time procurement situation. The Comptroller General concluded, reasonably, that Hazeltine's incorporation of a flat 10 percent contingency increment in its price proposals for spares and its assignment of higher prices to certain material components than those used for the same items in its price-redeterminable production contract could probably not have survived such scrutiny. That plaintiff was not as alert in its dealings with Hazeltine as it might have been does not rationally suggest, however, that it should bear the total burden of the latter's windfall. Because the entire matter of that windfall was brought to light by the Comptroller General only after "the horse had been stolen," in terms of performance by and payment to Hazeltine, and since the Comptroller's investigation led him to conclude that the Navy was at least as remiss in the matter as plaintiff, the preferred result is one shaped by equitable principles that apportion liability in accordance with relative

fault. *Dynalectron Corp v. United States,* 518 F.2d 594, 605, 207 Ct.Cl. 349, 368 (1975). The particular facts of this case fully support the GAO's conclusion that the fault was equal. The economic burden should be distributed accordingly.

## CONCLUSION

For the reasons given, plaintiff's and defendant's motions for summary judgment are both allowed and denied in part. Judgment is entered for the plaintiff in the amount of $197,048.50.