# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Kellogg Brown & Root Services, Inc. | )   ASBCA Nos. 56358, 57151 |
| | )                            57327, 58583 |
| | ) |
| Under Contract No. DAAA09-02-D-0007 | ) |

APPEARANCES FOR THE APPELLANT: Jason N. Workmaster, Esq.
Raymond B. Biagini, Esq.
Alejandro L. Sarria, Esq.
Herbert L. Fenster, Esq.
John E. Hall, Esq.
  Covington & Burling LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
ChristinaLynn E. McCoy, Esq.
MAJ Lawrence Gilbert, JA
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN ON THE GOVERNMENT'S MOTION TO DISMISS AND APPELLANT'S MOTION FOR SUMMARY JUDGMENT

These appeals involve costs incurred by Kellogg Brown & Root Services, Inc. (KBRS) and its subcontractors for private security to accompany company officials and convoys used to deliver food and other supplies to U.S. and coalition troops in Iraq during military operations in the 2003-2006 timeframe. Starting in 2007, the Army withheld a total of $44,059,024.49 from KBRS billings under the contract to recoup previously paid costs of private security that the government had determined were unallowable. Three of the appeals, ASBCA Nos. 56358, 57151 and 57327, are before us on remand from the United States Court of Appeals for the Federal Circuit, which held that the contract prohibited the use of private security companies (PSCs) but, in order to fully resolve the dispute, remanded the appeals to the Board to decide whether KBRS "properly raised its breach and remedy allegations, and if so, to rule on those contentions." *McHugh v. Kellogg Brown & Root Services, Inc.*, 626 F. App'x 974, 978 (Fed. Cir. 2015).

The fourth appeal, ASBCA No. 58583, is before the Board following KBRS's appeal from a deemed denial of its 29 September 2011 certified claim for breach of

contract. This appeal was not decided by the Board and was consolidated with the other three appeals only after the appellate remand. On 19 January 2016 the Board denied the government's pending motion to dismiss this appeal for lack of jurisdiction. *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58583, 16-1 BCA ¶ 36,233.

Following the Board's denial of the government's motion to dismiss in ASBCA No. 58583, KBRS filed a first amended and consolidated complaint (FACC) in all four appeals.[1] Thereafter the government filed a motion to dismiss as to all counts and appellant filed a motion for summary judgment. Oral argument was held on the motions on 23 August 2016.

## DISCUSSION

KBRS in its FACC asserts the following:

> Count I—the government's recovery on its claim is time-barred because the contracting officer's 30 January 2013 final decision was issued more than six years after the government's claim accrued, which was no later than 10 June 2005.
>
> Count II—KBRS is entitled to judgment because the Army breached its contractual obligation to provide adequate force protection and the use of PSCs was a permissible remedy.
>
> Count III—the Army breached the contract by requiring KBRS to perform beyond the original scope and the use of PSCs was a permissible remedy.
>
> Count IV—the Army breached the contract by failing to comply with the FAR 16.301-3 requirement to have available adequate resources to manage a cost reimbursement contract and use of PSCs was a permissible remedy.
>
> Count V—KBRS is entitled to judgment because the contract prohibition relied on by the Army applies only in peacetime, not during war.

---

[1] Prior to the filing of the FACC, KBRS's amended complaints in ASBCA Nos. 56358, 57151, and 57327, filed 16 January 2013, contained three counts: Count I (Breach of Contract), Count II (Waiver/Ratification), and Count III (Bad Faith).

Count VI—KBRS is entitled to judgment because the government waived the contract prohibition on the use of PSCs.

Count VII—KBRS is entitled to judgment because the Army cannot reopen the firm-fixed-price subcontracts at issue.

Count VIII—under a cost-reimbursement contract, KBRS is entitled to recover all of its incurred costs so long as they were not incurred due to fraud, lack of good faith, or willful misconduct.

Count IX—KBRS is entitled to judgment because the Army released KBRS from all claims related to the pricing and award of the ESS subcontracts.

Count X—KBRS is entitled to judgment because the Army contracting officer's 30 January 2013 final decision was invalid.

Count XI—the Army's damages calculation is inaccurate and unsupported.

Count XII—the Army acted in bad faith in its decision to recapture funds from KBRS.

KBRS has moved for summary judgment only on Counts II (breach of contract) and VI (waiver).

The affirmative defenses asserted by KBRS on 25 March 2013 in its complaint in ASBCA No. 58583 largely foreshadow the affirmative defenses articulated in KBRS's FACC. The only new counts in the FACC are Counts IV, V, and VII.

Before considering the parties' arguments, we address the parameters governing what is, and what is not, properly before us in these consolidated appeals. On appeal from our 2014 decision, the United States Court of Appeals for the Federal Circuit (hereinafter "court" or "Federal Circuit") was asked to decide two issues: (1) whether the Board erred in deciding that the contract did not prohibit the use of PSCs, and therefore that KBRS was entitled to payment for the use of PSCs; and (2) whether the Board erred in deciding that the Army's affirmative claim against KBRS contained in the contracting officer's final decision (COFD) issued 30 January 2013 was barred by the CDA's six-year statute of limitations. *McHugh,* 626 F. App'x at 976. The court affirmed the Board on the second issue, finding that the Army's 30 January 2013 affirmative claim was time-barred, but reversed the Board's holding that the contract did not prohibit the use of PSCs. *Id.* at 977, 979. The court recognized that "[t]his

3

narrow contract interpretation based on the weapons prohibition...may not fully resolve the dispute," and remanded to the Board to determine whether "KBR properly raised its breach and remedy allegations, and if so, to rule on those contentions." *Id.* at 978. In ascertaining the proper scope of the appeals now before us, we are mindful that our appellate mandate constitutes the law of the case on all issues that were explicitly or implicitly decided by the court. *Exxon Corp. v. United States*, 931 F.2d 874, 877 n.7 (Fed. Cir. 1991) (citing 1B J. MOORE, J. LUCAS & T. CURRIER, MOORE'S FEDERAL PRACTICE ¶ 0.404[10] at 172-74 (2d ed. 1988)). However, we do not read the court's opinion to foreclose the Board from considering and deciding other issues presented in these appeals that were not previously decided by the Board and were therefore never appealed.

## I.     The Government's Motion to Dismiss

The government has moved to dismiss all counts of KBRS's FACC and KBRS has responded in opposition. A short discussion of the approach taken by the government and how we intend to decide the motion to dismiss is in order. The government's motion, with respect to some counts of the FACC, asserts that they fail to state a claim upon which relief can be granted. With respect to other counts, the government asserts that the Board lacks jurisdiction to entertain them; and with respect to the remainder, the government argues that they are foreclosed either by law of the case or by the Federal Circuit's mandate. Because a government claim is at the heart of the matter and KBRS's complaint primarily consists of affirmative defenses to that claim, it is appropriate with respect to certain counts to treat the government's motion to dismiss as a motion to strike affirmative defenses under Federal Rule of Civil Procedure (FRCP) 12(f) rather than as a Rule 12(b)(6) motion to dismiss.[2] Further, in those instances in which the motion to dismiss relies on matters outside the pleadings, we may treat it as a motion for summary judgment. *Dongbuk R&U Engineering Co.,* ASBCA No. 58300, 13 BCA ¶ 35,389 at 173,637. And, unlike the usual circumstance in which a motion to dismiss for failure to state a claim is filed before the evidentiary record has been fully developed, a full record exists in these appeals. Thus, in considering the government's motion, we will look both to KBRS's FACC and the record in these appeals.

The parties' contentions on the government's motion to dismiss and the Board's related dispositions are as follows:

---

[2] In appropriate circumstances, where our rules do not address a matter, we commonly look to the Federal Rules of Civil Procedure for guidance. *TTF, L.L.C.,* ASBCA No. 58494, 13 BCA ¶ 35,343.

4

Count I (Government Claim Time-Barred) and Count X (COFD Invalid)

The government asserts that Count I fails to state a claim on which relief can be granted because all but nearly $12 million[3] of the total amount claimed in the final decision was the subject of both government withholding in 2007-2009 and subsequent KBRS claims, of which the Board has jurisdiction. Therefore, the three remanded appeals involve KBRS claims for withheld monies that are properly before the Board after remand. As to Count X, the Army states that the "invalidity" of the COFD, like its untimeliness, has no logical connection to whether KBRS is entitled to recover on its claims for the withheld sums.

KBRS responds that what is at issue here is a government claim and that claim is untimely as to the $44 million that was withheld as well as the $12 million that was not. At oral argument, KBRS summed up its position as being that the government needed to issue timely COFDs on the withheld amounts in order to "perfect" its claim (tr. 38). KBRS further states that in the absence of a COFD on the government's claim for the $44 million, KBRS's 2007, 2009, 2010 and 2011 claims (which KBRS calls "submissions") did not "magically convert" a government claim into contractor claims. Rather, the principal effect of KBRS's claim submissions was to start the running of CDA interest and ensure that the Board had jurisdiction over any subsequent appeals by KBRS. (App. opp'n at 5-6)

The government replies that the Army's notices of withholding were administrative claims which KBRS could have appealed, but it chose to submit its own claims for the monies withheld and then appeal from the deemed denials of those claims (gov't reply at 3-5).

We conclude that Counts I and X of the FACC are within the proper scope of our consideration. Both of these counts were asserted by KBRS in its complaint in ASBCA No. 58583 in March of 2013. They were not decided by the Board and thus were not appealed.

As previously found by the Board, the Army procuring contracting officer (PCO) and the Defense Contract Audit Agency (DCAA) first notified KBRS by letter dated 6 February 2007 and DCAA Form 1 (No. 127) of the same date that they were respectively "adjusting payments" (PCO) and "suspending" costs (DCAA) in the amount of $19,652,815 representing PSC costs incurred by KBRS's subcontractor,

---

[3] As to the nearly $12 million affirmative claim, the Board's holding that this claim was untimely was affirmed on appeal; therefore, this part of the claim is no longer before the Board. The exact amount was $11,561,567.55. *Kellogg Brown & Root Services, Inc.,* ASBCA No. 56358 *et al.,* 14-1 BCA ¶ 35,639 at 174,520.

5

ESS, in performing the contract (finding 70)[4]. On 22 October 2007, KBRS submitted a certified claim to the PCO for the withheld amount. Following a deemed denial, KBRS appealed to the Board and the appeal was docketed as ASBCA No. 56358. (Finding 72; *see also* KBRS's FACC ¶¶ 7, 70, 73-74)

On 24 August 2009, KBRS submitted an invoice under the contract for payment of $22,279,678.49. On or about 1 September 2009, the government withheld the entire amount of the invoice on the recommendation of DCAA to "take immediate action to recoup the disapproved costs" in a revised DCAA Form 1 (No. 127 Revision-1, 3 August 2009). KBRS submitted a certified claim to the PCO on 20 October 2009 for $21,131,743 of the withheld amount. When no decision issued on its claim, KBRS appealed the deemed denial of its claim and the appeal was docketed as ASBCA No. 57151. (Finding 75)

In March 2010, the government withheld an additional $2,126,531 from payments otherwise due under the contract to recoup additional PSC costs. Thereafter, on 16 June 2010, KBRS submitted a certified claim for that amount plus the remainder of the 1 September 2009 withholding for a total claim amount of $3,274,466.49. Following the PCO's failure to issue a final decision on the claim, KBRS appealed the deemed denial and it was docketed as ASBCA No. 57327. (Finding 76; *see also* KBRS's FACC ¶¶ 9, 83-84)

The applicable legal standard in considering a motion to strike pursuant to FED. R. CIV. P. 12(F) is whether the pleading asserts an "insufficient defense" or contains any "redundant, immaterial, impertinent, or scandalous matter." Only if a defense is insufficient as a matter of law will it be stricken. *Danac, Inc.*, ASBCA Nos. 30227, 33394, 88-3 BCA ¶ 20,993 at 106,071; *Space Age Engineering, Inc.*, ASBCA No. 25761 *et al.*, 83-2 BCA ¶ 16,789 at 83,439 (citing *Anchor Hocking Corp. v. The Jacksonville Electric Authority*, 419 F. Supp. 992 (D.C. M.D. Fla. 1976)).

We conclude, based on the facts alleged in the FACC (as well as the facts previously found by the Board), that the PCO issued timely final decisions on the government's claim. As set forth above, the government's claim was asserted by the PCO, in writing, by set-off and withholding, in February 2007, September 2009, and March 2010. In *Placeway Construction Corp. v. United States*, 920 F.2d 903, 906-07 (Fed. Cir. 1990), the court reversed the lower court's dismissal for lack of jurisdiction where the contractor had appealed from the government's assertion of a right of set off. Though there was no "final decision" labeled as such and no notice of appeal rights, the court held that the CO had effectively issued a final decision and granted a government claim in the amount of the set off. *See also KAL M.E.I. Manufacturing & Trade, Ltd.*,

---

[4] References to "findings" refer to findings of fact in our previous decision, *Kellogg Brown & Root Services*, 14-1 BCA ¶ 35,639.

ASBCA No. 44367 *et al.*, 94-1 BCA ¶ 26,582 at 132,257 (citing *Placeway*, 920 F.2d at 902) (government's withholding constituted "a final decision on a government claim").

Likewise, here the PCO's decisions may not have conformed to the usual COFD format, including the language required by the CDA to inform a contractor of its appeal rights, but they were nevertheless a "formal and final action equivalent to a decision from which the contractor could appeal." *P.X. Engineering Co.*, ASBCA No. 38215, 89-2 BCA ¶ 21,859 at 109,952 (contractor could appeal from unilateral contract modification); *see also Systron Donner, Inertial Division*, ASBCA No. 31148, 87-3 BCA ¶ 20,066 (CO's determination of CAS noncompliance was appealable final decision). The decisions were issued within six years of the date we previously found that the government knew or should have known of the use of PSCs to perform the contract–10 June 2005. *KBRS*, 14-1 BCA ¶ 35,639 at 174,520. KBRS could have directly appealed the PCO's withholdings but chose to file claims contesting the withholdings in order to start the running of CDA interest. Moreover, KBRS has not been prejudiced by the omission of final decision language and an explanation of appeal rights, as is evidenced by its prompt filing of certified claims and appeals from deemed denials. Thus, we agree with the government that the affirmative defenses contained in Counts I and X should be stricken because they fail as a matter of law, and grant the government's motion to strike as to Counts I and X of the FACC.

Counts II (Prior Material Breach–Force Protection), III (Prior Material Breach–Cardinal Change), and IV (Prior Material Breach–Noncompliance with FAR 16.301-3)

The government contends that Counts II, III and IV should be dismissed for lack of jurisdiction because KBRS did not submit a claim to the CO alleging these grounds for relief (gov't mot. at 4-6). In the alternative, for any of the three counts for which the Board finds it has jurisdiction, the government moves to dismiss for failure to state a claim for relief, on the grounds that KBRS is not entitled in law to breach the contract as a remedy for the government's breach (*id.* at 6-7), and also that KBRS has no valid claim for breach for the government's alleged failure to provide required force protection because it had adequate remedies under the contract (*id.* at 8-9). Finally, with respect to the same three counts, the government argues in the alternative that they are time-barred because KBRS's September 2011 claim for breach was filed more than six years after accrual of the claim (*id.* at 9).

For its part, KBRS argues that the Board has jurisdiction over Counts II through IV because these counts, which allege different prior material breaches by the government, are common law defenses to the government's claim which are not required to be submitted to a contracting officer (CO) for a decision; and in any event, the allegations made in the counts fall "within the scope" of four previous claims submitted to the PCO (app. opp'n at 7-13). Because common law defenses are not

required to be the subject of claims, the government's argument that Counts II through IV are time-barred also fails (*id.* at 22). Addressing the government's alternative ground for dismissal, KBRS contends that the counts state a claim upon which relief can be granted, because a party's prior material breach excuses the other party's later breach (*id.* at 14-18). KBRS adds that the government is foreclosed from claiming that KBRS had an adequate contract remedy and could have delayed its performance without penalty under the contract's "excusable delay" clause, because this issue was decided against the government in the Board's 2014 decision and was not appealed (*id.* at 18-19).

In reply, the government argues that KBRS is only entitled to assert that a "mere defense" need not be submitted to a contracting officer for decision if it has timely appealed from a government claim (gov't reply at 6). The government argues with respect to Counts II-IV that KBRS's submission of certified claims for the amounts withheld by the government means that the appeals do not involve a government claim,[5] thus restricting the Board's jurisdiction to the contents of KBRS's certified claims (*id.*). Further, the government posits that KBRS was required under *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010), to have submitted a timely certified claim of breach because it alleges that the government's prior material breach excused KBRS from complying with any contract prohibition on the use of PSCs and thus "seeks an adjustment of contract terms." (*Id.*)

Counts II-IV are within the proper scope of our consideration on remand. Counts II and III were asserted as affirmative defenses in ASBCA No. 58583 in KBRS's complaint filed 25 March 2013, and have not yet been decided by the Board. Additionally, our appellate mandate specifically instructs us to consider whether KBRS's breach and remedy allegations are properly before us and, if so, to rule on them. Count IV was not separately asserted until KBRS filed its FACC, but it, along with Counts II and III, asserts prior material breach as an affirmative defense.

We also conclude that we have jurisdiction over Counts II-IV. The government argues that the Board lacks jurisdiction because the "claims" asserted by these three counts were not clearly presented to the contracting officer for a decision (gov't mot. at 4-6). We have already found that KBRS's 29 September 2011 breach claim underlying Count II adequately apprised the PCO that the basis for the claim was the Army's failure to meet its contractual obligation to provide force protection,[6] and the government withdrew its request for reconsideration of that finding at oral argument

---

[5] We note this assertion is inconsistent with the government's argument with respect to Counts I and X that KBRS could have appealed directly from the government claims effected by the Army's notices of withholding (gov't reply at 4-5).

[6] *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58583, 16-1 BCA ¶ 36,233 at 176,771.

8

(tr. 45). As to Counts III and IV, they were not presented to the Army CO for decision. We hold as to all three counts that they are affirmative defenses that do not seek adjustment of the terms of the contract, and therefore did not need to be presented to the CO for decision for the Board to have jurisdiction under *M. Maropakis. Laguna Construction Company v. Carter*, 828 F.3d 1364, 1369-73 (Fed. Cir. 2016); *see also ASFA International Construction Industry and Trade, Inc.*, ASBCA No. 57880, 14-1 BCA ¶ 35,736 at 174,911.

The government also argues that KBRS is entitled to assert a "mere defense" to a government claim only if it has timely appealed from a government claim and that the appeals before us do not involve a government claim because KBRS filed its own claims for the withheld costs. Both parties have shifted position on whether it is a contractor claim or a government claim that is before us, depending on the results produced. We have already held with respect to Counts I and X, to the government's benefit, that these appeals involve timely asserted government claims to recover allegedly unallowable costs previously paid. With respect to Counts II through IV, we hold the same, this time to the detriment of the government's argument. Additionally, because these counts each invoke prior material breach and thus are affirmative defenses that need not have been presented to the CO for a decision, we reject the government's further argument that they are time-barred by the CDA's six-year statute of limitations (gov't mot. at 9). In doing so, we deem it unnecessary to determine whether KBRS's 29 September 2011 claim would have been timely if in fact it constituted a contractor claim rather than a defense to a government claim.

Alternatively, the government asserts that Counts II through IV fail to state a claim for relief. The government argues that hiring and billing the government for the costs of PSCs does not qualify as "mitigation of damages" and that a prior material breach by the government does not entitle KBRS to also breach the contract while continuing to perform it. In other words, KBRS had to choose between ending the contract and electing to continue performance, and if it chose the latter, its contract obligations continued in full force and effect. (Gov't mot. at 6-7) The government also contends that KBRS had no valid claim of breach because it had contractual remedies for government failures to provide force protection (gov't mot. at 8).[7]

---

[7] In a footnote, the government reiterates its argument that Count II independently fails to state a claim for relief because adjudication of whether the Army provided force protection "commensurate with the threat" is a non-justiciable political question. The Board previously rejected this argument on the ground that we have jurisdiction to determine whether the government met its contractual obligations. *KBRS*, 14-1 BCA ¶ 35,639 at 174,522. This issue was not appealed, and we consider it foreclosed under the doctrine of law of the case. *See Exxon Corp.*, 931 F.2d at 877 n.7.

The doctrine of prior material breach holds that when a party to a contract is sued for breach, it may defend on the ground that a legal excuse for its nonperformance existed at the time of the alleged breach. Faced with two parties to a contract, each of whom claims breach by the other, courts will often impose liability on the party that committed the first material breach. *Long Island Savings Bank, FSB v. United States*, 503 F.3d 1234, 1251 (Fed. Cir. 2007) (false certification constituted material failure of performance precluding plaintiffs' claim for breach damages) (citing *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1380 (Fed. Cir. 2004); and *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004)).

In *Laguna Construction*, 828 F.3d 1364, the Federal Circuit affirmed the ASBCA's grant of summary judgment to the government on its affirmative defense of prior material breach. The contractor had filed a claim for the unpaid costs of performing an environmental remediation and construction contract in Iraq. It then appealed to the Board from the contracting officer's deemed denial of its claim. Meanwhile, the government had been investigating allegations that Laguna's employees were receiving kickbacks from subcontractors. Several employees and officers of Laguna pled guilty to criminal indictments from 2010 to 2013. After the last of these pleas, the government moved to amend its answer in the appeal to include the affirmative defense that it was not liable for Laguna's claim since Laguna had committed a prior material breach of the contract by soliciting and accepting kickbacks, which constituted fraud against the United States. In granting summary judgment for the government, the Board observed that Laguna had breached the duty of good faith and fair dealing by its acts of fraud, and had also breached the Allowable Cost and Payment clause, FAR 52.216-7, by submission of vouchers that were improperly inflated to include the kickbacks.

The Federal Circuit affirmed the Board on the grounds that Laguna committed the first material breach by violating the Allowable Cost and Payment clause, which states that a cost is allowable only if it is reasonable and complies with the terms of the contract. *Laguna*, 828 F.3d at 1372-73. The court found "unpersuasive" Laguna's argument that the remedies available to the government under the contract's termination and Anti-Kickback clauses foreclosed application of the common law defense of prior material breach. The court stated that the government could have availed itself of those clauses, but was not required to do so, and "may use the prior material breach doctrine to defeat a contractor's breach claim." *Id.* at 1371. The court also rejected the argument that the government waived the defense by continuing to perform the contract until 2015 when it knew of the kickbacks as early as 2008, finding it was reasonable of the government to wait to invoke the defense until after the last of the guilty pleas was entered. *Id.* at 1372.

10

With that background, we address the arguments that the government makes in pressing its case that Counts II-IV fail to state a claim. First, the government advances the proposition that a party who chooses to continue to perform waives any prior material breach as a matter of law (gov't mot. at 6-7). We do not agree. In *Northern Helex Co. v. United States*, 197 Ct. Cl. 118, 129 (1972), the government's primary defense to the contractor's claim for breach damages for nonpayment on a contract to deliver helium was that the contractor waived its right to claim total breach by continuing performance and treating the lack of payment as immaterial. The court acknowledged that "there is venerable authority" that when performance is continued in spite of a known breach, the wronged party can no longer avail itself of that excuse. However, the court observed that "it is very doubtful that, even when first formulated, that rule disregarded particular circumstances justifying further performance in the specific case." *Id.* at 125.

While acknowledging "the general proposition" that a party cannot continue performing after a material breach (although stopping performance would be fair and convenient), run up damages, and then go to court, the court found for two reasons that Northern Helex had not waived its right to damages for the government's material breach. First, the contractor's continued performance was commercially reasonable, because its helium extraction facilities were so interrelated with the rest of its operations that its helium facilities must continue in operation whether the helium was sold or wasted, and since it had no storage facilities, and there was no other market for the gas, it had no realistic alternative but to continue to tender helium to the government. *Northern Helex*, 197 Ct. Cl. at 126. As Judge Davis concluded:

> [T]o determine whether waiver has occurred, a more complex inquiry must be made than merely, "did performance continue?" The guiding principle is whether, in the individual circumstances, the seller exercised "reasonable commercial judgment" in continuing to manufacture and deliver, in the effort to mitigate damages, although his obligation to perform has been discharged by the buyer's total breach.

*Id.* at 129.

Second, there was a "special aspect" to the case, which was that "the action taken by Northern Helex was consistent with the purpose of the program, the conservation of a valuable national resource." The court went on to elaborate:

> In considering the Government's failure to observe the procedural requirements of the National Environmental Policy Act of 1969 when it terminated the contracts of the

11

three other suppliers, the Tenth Circuit characterized the termination as "an action which has environmental consequences, namely rapid depletion of the helium resources of the country." *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971). The decision, requiring that the Secretary at least consider the environmental impact of his action, is predicated on the view expressed by Congress "that it is in the national interest to foster...[the development and] distribution of supplies of helium...sufficient to provide for essential government activities."

*Northern Helex*, 197 Ct. Cl. at 126 (footnote and citation omitted). This "special aspect" was also held by the court to be good reason for the company's continued performance.

The record in these appeals similarly supports the conclusion that continuing to perform the contract with PSC protection was not only a commercially reasonable decision on the part of KBRS and its subcontractors,[8] but also that it was consistent with the purpose of the contract and in the national interest. In our previous decision we cited testimony that, for example, without a convoy every three days the military dining facilities would run out of food to feed the soldiers (finding 52), underscoring the important national interest in continuing to run the supply convoys. We also noted that the contract was a "rated" order potentially subjecting KBRS to criminal penalties for failure to deliver within the required time. *KBRS*, 14-1 BCA ¶ 35,639 at 174,521. Thus, KBRS's affirmative defenses of prior material breach (Counts II-IV) are not insufficient as a matter of law simply because KBRS continued to perform the contract.

The government also argues that the defense of prior material breach is inapplicable here because it is a defense to a claim of breach and the government has not asserted a claim of breach against KBRS (gov't reply at 10). We disagree. The government's claim against KBRS, that KBRS and its subcontractors violated the contract prohibition against employing PSCs and that KBRS billed the government for

---

[8] We also note that while KBRS was continuing to perform, Army COs with knowledge of KBRS/subcontractor use of PSCs continued paying KBRS's invoices and took no other action to stop the use of PSCs. The Army did not seek to disallow PSC costs until February 2007. Under the circumstances, it would have been reasonable for KBRS to think, at least until February of 2007, that the parties had achieved a mutually acceptable solution that allowed KBRS to continue to accomplish its warfighter support mission despite the acknowledged force protection issues.

unallowable PSC costs in violation of the Allowable Cost & Payment clause, is plainly a claim of breach regardless of the fact that the government may not have used the word "breach" to describe its claim. *See also Laguna*, 828 F.3d at 1371 (contractor, by billing the government for unallowable costs, violated the Allowable Cost & Payment clause and committed material breach of contract).

The government's next argument is that KBRS cannot claim that its PSC costs were incurred to mitigate the damages caused by the Army's prior material breach because, under Count II, the PSC costs *are* the damages caused by the alleged breach (gov't reply at 10). In its FACC, KBRS alleges both that it incurred the PSC costs to mitigate damages caused by the Army's prior material breach, and that the Army's prior material breach excused it from any subsequent failure to comply with the contract's prohibition on the use of PSCs (FACC ¶¶ 123-25). Although we are not convinced that these types of damages are mutually exclusive,[9] we do not think that the government's proffered distinction between PSC costs as damages caused by a breach and PSC costs as costs incurred in mitigation of damages that otherwise would result from a breach makes a difference in the context of deciding the government's motion to dismiss, because in these appeals KBRS is first and foremost asserting prior material breach as a defense to the government's claim of breach.

The government's last argument for the proposition that Counts II-IV "fail to state a claim for relief" is that the contract afforded KBRS adequate remedies for any government-caused delays pursuant to the Changes and Excusable Delay clauses and therefore the dispute arises "under the contract," rendering KBRS's breach claim invalid (gov't mot. at 8). The government recognizes that the Board previously rejected its argument that KBRS's sole remedy for government failure to provide the level of force protection promised in the contract was delay, but argues that our prior ruling rested principally on the premise that the contract allowed the use of PSCs (*id.*). This notion is not supported by the government's citation to our 2014 decision. In our prior decision we rejected the identical argument, stating that it was fortunate for the troops who depended on KBRS for life support that KBRS and its subcontractors did not adopt the attitude now suggested by the government. We also noted that the contract was a "rated order" under which a failure to deliver within the required time could be subject to criminal penalties. Only then did we observe that "[m]oreover, the

---

[9] For example, if the alleged breach had not occurred (i.e., the contractually promised level of force protection had been provided by the Army to KBR and its subcontractors), KBRS and its subcontractors would not have incurred PSC costs (damages). But also, if KBRS and its subcontractors had not hired and paid PSCs to perform their missions when force protection was not available, it is entirely conceivable that the resulting damages could have been vastly in excess of the cost of the PSCs. (*See* app. reply at 9-11)

government's argument presupposes that PSCs were prohibited under the terms of the contract." *KBRS*, 14-1 BCA ¶ 35,639 at 174,521. Clearly, this additional observation was not the driver of our rejection of the government's "delay" argument. And since our 2014 decision, the Federal Circuit issued its decision in *Laguna* in which it explicitly held that the availability of a contract remedy does not mean the wronged party must avail themselves of that remedy in lieu of the affirmative defense of prior material breach. 828 F.3d at 1371. The government is bound by our prior holding which is the law of the case. *Exxon Corp.*, 931 F.2d at 877 n.7.

The government also attempts in its motion to distinguish between "mere delay," which it states is permissible under a rated order, and "willful failure to perform," which is not permissible (gov't mot. at 8). We decline the invitation to reconsider our prior holding on the basis of a hypothetical dividing line between "mere delay" in deliveries and willful failure to perform. The record in these appeals indicates that any such line was extremely thin, if not non-existent. The military dining facilities needed to be resupplied no less often than every three days to keep the soldiers fed. (Finding 52) Moreover, we have found as fact that during the years 2003-2006 the government was unable to provide force protection at the levels specified in the contract and that the use of PSCs by KBRS and its subcontractors to supplement government force protection was reasonably necessary to accomplish the logistical support mission of the contract and task orders thereunder. *KBRS*, 14-1 BCA ¶ 35,639 at 174,521, and findings 13-60.

Therefore, we conclude that the affirmative defenses of prior material breach contained in Counts II-IV are not insufficient as a matter of law simply because the Excusable Delay clause was incorporated into the contract.[10] The government's motion to strike is denied as to Counts II, III, and IV.

Counts V ((LOGCAP III Special H Clauses Applied Only in Peacetime), VI (Army Waived Contract's Prohibition on Use of PSCs), VII (The Army is Prohibited from Re-opening Firm-Fixed-Price Subcontracts), and VIII (KBRS is Entitled to Reimbursement of Its Incurred Costs Absent Evidence of Willful Misconduct)

The government moves to dismiss these four counts as foreclosed by either law of the case or by our appellate mandate (or both). As to Counts V and VIII, the government contends that "[t]hese counts must be dismissed because they conflict with the Federal Circuit's express holdings that the H Clauses were applicable and barred the use of armed PSCs in contract performance" (gov't mot. at 10). As to Count VII, the government points out that in *Kellogg, Brown & Root Services, Inc.*,

---

[10] While the government's motion also mentions that the contract contained the Changes clause, it makes no argument regarding remedies available under that clause (gov't mot. at 8).

14

ASBCA No. 56358, 12-1 BCA ¶ 35,001 at 172,015, we held that "[i]n the context of determining the reasonableness of a subcontract fixed price under a cost reimbursement prime contract, the government may properly consider the components of that subcontract fixed price." And as to Count VI, the government states that KBRS's waiver argument is foreclosed by the Federal Circuit's declination of KBRS's invitation to affirm the Board's 2014 decision on the alternative ground that the government gave permission to KBRS and its subcontractors to use PSCs, stating that "we do not find any of those purported alternative grounds persuasive."[11] As to these four counts, we treat the government motion as one to strike affirmative defenses.

KBRS in response states that the issue of whether the contract's H clauses only applied in peacetime (Count V) was never squarely before the Federal Circuit because the Board never decided it. It was presented on appeal only as an alternative ground on which the appellate court could affirm the Board's decision, and was opposed by the government not on the merits, but because the Board had not made findings on the issue and a remand would be necessary before it could be considered (app. opp'n at 24-25). As to Count VI (waiver), KBRS opposes the government motion on the ground that the "permission" argument that it advanced on appeal as an alternative ground for affirmance is distinct from the "waiver" defense asserted in Count VI–while the former advances the proposition that use of PSCs was allowed, the premise of the latter is that the use of PSCs was not allowed but this restriction was waived by the government. Thus, the appellate decision should have no effect on KBRS's ability to pursue its waiver defense. (Id. at 26-27)

On Count VII, KBRS points out that the Board expressly advised the parties that its 2012 decision denying cross-motions for summary judgment was interlocutory and any error therein was subject to correction in the Board's final decision on the merits following the hearing. KBRS adds that during the hearing on the merits, the presiding judge invited it to raise the argument again in its post-hearing briefing, and it did so. Therefore, it concludes, the issue is not foreclosed. (App. opp'n at 27-28) With respect to Count VIII, KBRS responds that the Federal Circuit's opinion was limited to the contract interpretation issue and neither explicitly nor implicitly reached KBRS's argument that under a cost reimbursement contract a contractor is entitled to recover all its incurred costs unless they stem from fraud, lack of good faith, or willful misconduct (id. at 28-29).

In reply, the government cites to the transcript of the hearing on the merits to argue that the presiding Board judge had no interest in revisiting the issue presented by Count VII and in fact did not revisit it in the Board's decision on the merits, confirming that the issue was settled (gov't reply at 19). The government also points

---

[11] Count VI was not part of the government's original motion to dismiss, but was added to it by letter supplement dated 9 February 2016.

out that KBRS has not distinguished *Grumman Aerospace Corp. v. United States*, 549 F.2d 767 (Ct. Cl. 1977), the precedent on which the Board relied in its 2012 decision, and that the Federal Circuit did not find this ground persuasive when it was raised on appeal as an alternative ground for affirmance (gov't reply at 19).

Which of these counts pose issues that are properly before us at this stage of the proceedings? Count V asserts as a defense that the H clauses which the Federal Circuit interpreted in deciding the contract interpretation issue raised in the government's appeal only applied in peacetime and thus were inapplicable to performance in the war conditions under which the PSC costs were incurred. While we acknowledge KBRS's argument that this issue was not before the Federal Circuit on appeal because it was never decided by the Board, we conclude that this issue is foreclosed on remand. The court's holding on appeal that the H clauses prohibited KBRS and its subcontractors from hiring PSCs by necessary implication decides the issue of whether the H clauses were applicable. *SUFI Network Services, Inc. v. United States*, 817 F.3d 773, 779 (Fed. Cir. 2016), and cases cited therein. Therefore, we grant the government's motion and strike the affirmative defense presented in Count V.

Count VI asserts the affirmative defense that the Army waived any right to refuse to reimburse the PSC costs incurred by KBRS or its subcontractors on the basis that use of PSCs was prohibited by the contract. We agree with KBRS that the defense of waiver is distinct from the argument advanced by KBRS on appeal that it received "permission" to use PSCs as an alternative ground for affirming our 2014 decision. Moreover, the waiver defense was asserted by KBRS in the remanded appeals (ASBCA Nos. 56358, 57151, and 57327) well prior to the hearing on the merits, but was not decided by the Board and not appealed by the government, and was not, therefore, before the Federal Circuit on appeal.[12] And, since the issue was not decided by us on the merits, and was not necessary to the Federal Circuit's disposition of the contract interpretation issue, we are not barred from considering it on remand. *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951-52 (Fed. Cir. 1997) (citing *Conway v. Chemical Leaman Tank Lines, Inc.*, 644 F.2d 1059, 1062 (5th Cir. 1981)). The government does not raise any argument in support of its motion to strike Count VI other than its argument that consideration of Count VI is foreclosed by our appellate mandate. Therefore, we deny the government's motion as to Count VI.

We also find that Count VII is properly before us and that we may consider it in these remand proceedings. The Board's 2012 decision denied the parties' cross-motions for summary judgment. In the course of doing so, the Board addressed

---

[12] KBRS also asserted the defense of waiver in Count V of its initial complaint in ASBCA No. 58583, which was filed on 25 March 2013. The issue has not been decided in that appeal either.

16

KBRS's contention that the government has no contractual right to disallow a particular component of a subcontract fixed price:

> However, none of the authorities cited for this proposition involved the allowability of a questioned component of a subcontract fixed price as a reimbursable cost under a cost reimbursement prime contract. In the context of determining the reasonableness of a subcontract fixed price under a cost reimbursement prime contract, the government may properly consider the components of that subcontract fixed price. [Citation omitted]

*KBRS*, 12-1 BCA ¶ 35,001 at 172,015 (citing *Grumman Aerospace Corp.*, 549 F.2d at 774-75). The Board noted that there remained a genuine issue of material fact as to whether, at the time the 11 subcontracts at issue were awarded, the component for PSC costs included in the subcontract fixed prices was reasonable as to both the need for, and the amount of, that component. *Id.* at 172,016. After a hearing on the merits, the Board found as a matter of fact that the PSC costs incurred by KBRS and its subcontractors were reasonable under FAR 31.201-3(a). *KBRS*, 14-1 BCA ¶ 35,639 at 174,521. The Board did not address in that decision KBRS's contention that the government could not disallow specific components of the price of a firm-fixed-price subcontract, presumably finding it unnecessary in light of its holding that the contract did not prohibit the use of PSCs.

The law of the case doctrine does not apply to issues that were not decided. 18B WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE: LAW OF THE CASE 2d § 4478 at 664-67. In its 2012 interlocutory decision the Board's discussion of the *Grumman Aerospace* case may well have been *dicta*, since it was not necessary to the result–denying the cross-motions for summary judgment on the basis of unresolved issues of material fact. But even if the Board's discussion was more than *dicta*, it did not decide the issue presented to us now. The defense presented to us by KBRS in its FACC Count VII is:

> Under applicable regulations, including the FAR, and the federal common law applicable to government contracts, the Army is barred from reopening firm-fixed price subcontracts awarded under a cost-reimbursement prime contract to contest the allowability of a particular component included in the subcontract price.

(FACC at 29, ¶ 180) KBRS alleges in Count VII that it awarded the subcontracts in issue between 2003 and 2006 pursuant to its approved purchasing system for the provision of dining and other logistical support services at total prices it determined

17

were fair and reasonable based on competition and/or price analysis. The government's position all along in this case has been that the costs in question are unallowable based on the contract's prohibition against using PSCs, not that the total subcontract prices were unreasonable. Presumably for that reason, the government did not appeal the Board's finding that the PSC costs incurred by KBRS and its subcontractors were reasonable.[13]

Because the issue presented by Count VII was presented to but not decided by the Board, and was neither before the Federal Circuit on appeal nor necessarily implicated in its decision, we do not view the appellate court's statement that the alternate grounds (one of which mirrored Count VII) presented by KBRS for affirmance were "not persuasive" to signify anything other than that the court declined KBRS's invitation to affirm on alternate grounds not properly before it. In conclusion, Count VII is properly before us now. The government's motion to strike is denied as to Count VII.

We also find that Count VIII is properly before us. This defense—that under a cost reimbursement contract KBRS is entitled to recover its incurred costs absent evidence of fraud, lack of good faith, or willful misconduct—was raised by KBRS in its 25 March 2013 complaint in ASBCA No. 58583 and has not been decided on the merits. We do not agree with the government that the Federal Circuit's decision that the contract prohibited the use of PSCs equates to a finding that the costs of PSCs are unallowable under the contract (gov't reply at 20). We note the court itself characterized its decision as one of "narrow contract interpretation based on the weapons prohibition" and did not purport to decide the question of cost allowability. *McHugh*, 626 F. App'x at 978.

The case law cited by the government does not persuade us to its view. *Geren v. Tecom, Inc.*, 566 F.3d 1037, 1041 (Fed. Cir. 2009) merely recognizes that to be allowable a cost must comply with the "terms of the contract," and that "where neither the contract nor the FAR dictates the treatment of specific costs, we must determine how those costs are to be treated by looking to" the principles and standards in FAR Subpart 31.2. In this case, there was no term of the contract or FAR cost principle dictating the treatment of PSC costs.[14] In *Kellogg, Brown & Root Servs., Inc. v.*

---

[13] To be sure, we recognize that the government's position may also be that the costs were unreasonable because they were specifically prohibited by contract. However, that position is still based on a term of the contract disallowing a specific type of cost, not any determination that the total price of the subcontracts was unreasonable, which was what the *Grumman Aerospace* case and the Board's 2012 decision addressed.

[14] In *Geren*, the court noted that costs resulting from a breach of a contractual obligation are not allowable costs under a contract. 566 F.3d at 1043 (citing *Dade Brothers, Inc. v. United States*, 325 F.2d 239, 240 (Ct. Cl. 1963)). This

*United States*, 728 F.3d 1348, 1359 (Fed. Cir. 2013), the Federal Circuit rejected a similar argument made by KBRS in that case, holding that in determining the reasonableness of costs, evidence of willful misconduct, gross negligence, or arbitrary conduct could be relevant, but such evidence is not required to disallow costs as unreasonable. This is a ruling by our appellate authority in a different case. It is binding precedent, but it does not implicate the law of the case doctrine or otherwise preclude us from deciding a similar issue on the record created in these appeals. Therefore, the government's motion to strike is denied as to Count VIII.

Count IX (The Army Released KBRS from All Claims Related to the Pricing and Award of Eleven ESS Subcontracts and KBRS is Entitled to Recover PSC Amounts Associated with Those Subcontracts)

The government moves to dismiss Count IX or in the alternative for summary judgment on the ground that PSC costs were expressly excluded from the 2010 and 2011 settlement agreements relied on by KBRS, either by the underlying Forms 1 or by the underlying audit reports (gov't mot. at 12). KBRS maintains that any exclusion in the underlying Forms 1 is ineffective to counter the broad language of the settlement agreements (app. opp'n at 29). The government replies that the settlement agreements clearly state their intent to settle only claims relating to the specified Forms 1, which do not include the Form 1 in which DCAA questioned the PSC costs, No. 127 and revision 1 to same, which has not been settled (gov't reply at 20, ex. G-4). We treat this portion of the government's motion as one for summary judgment on Count IX. There are no material facts in dispute, only the parties' differing interpretations of the settlement agreements.

The two settlement agreements are appended to the government's motion as exhibits G-5 (2010 agreement) and G-6 (2011 agreement). The 2010 settlement agreement recites that it is in settlement of five specified DCAA Forms 1: Nos. 143, 145, 147, 148, and 153, for a total of $13,269,983 including $12,349,633 in direct subcontract cost (ex. G-5 at 2-3). The 2011 settlement agreement similarly states that it is in settlement of six specified Forms 1: Nos. 142, 144, 151, 152, 154, and 157, for a total of $34,236,526 including $33,024,789 in direct subcontract cost (ex. G-6 at 2-3). Both settlement agreements contain the following language (with one minor grammatical variation not pertinent to the meaning):

---

case was remanded to us with specific instructions to determine if KBRS's breach of the contractual prohibition on use of PSCs was excused by the government's prior material breach. With this issue open, we infer that the absence of any determination in the court's decision on the allowability of the costs was a considered choice.

> [T]he Government, to the extent permitted by law, remises, releases, and discharges the Contractor, its officers, agents, and employees of and from all civil liabilities, obligations, claims, appeals, and demands which it now has or hereafter may have, whether known or unknown, administrative, judicial, legal, or equitable, arising under or in any way related to the Forms 1.

(Ex. G-5 at 4, ¶ 8, ex. G-6 at 4, ¶ 5)

Four of the underlying Forms 1–Nos. 142, 144, 152, and 154–specifically excluded the PSC costs disapproved by Form 1 No, 127, revision 1 (ex. G-7 at 9, ex. G-9 at 10, ex. G-14 at 11, ex. G-16 at 13). A review of the remainder of the Forms 1, along with their underlying audit reports, makes it clear that PSC costs are not among the costs disapproved (exs. G-8, G-10-13, G-15, G-17-24). Therefore, PSC costs were not within the scope of the two settlement agreements and KBRS's contentions to the contrary must fail. Moreover, KBRS does not dispute that the Form 1 disallowing the PSC costs has not been settled.

We note also that the settlement agreements resulted in a near-complete win for KBRS: of the disapproved costs that were the subject of the 2010 agreement, KBRS recovered $12,349,633 out of a total of $13,269,983. Of the disapproved costs that were the subject of the 2011 agreement, KBRS recovered $31,073,009 out of a total of $33,024,789 in direct subcontract costs, plus applicable overhead and base fee. (Ex. G-5 at 3, ex. G-6 at 3-4) These numbers render nonsensical KBRS's argument that the settlements encompassed subcontract PSC costs, since if one were to believe that to be true, it would lead to the conclusion that KBRS has already recovered the vast majority of those costs.

For the reasons stated, we grant summary judgment to the government on Count IX of the FACC.

Counts XI (Army's Quantum Calculation is Inaccurate and Unsupported) and XII (Army Acted in Bad Faith)

KBRS asserts in Count XI of the FACC that, for several reasons, the damages calculation underlying the Army's withholding is flawed. This contention is premature at best and, in the interests of judicial economy, we see no reason to address it before entitlement has been decided. Therefore, the government's motion to dismiss Count XI is denied without prejudice to its reinstatement in appropriate circumstances.

In Count XII KBRS states it is entitled to findings of fact that the Army acted in bad faith by, it alleges, effecting the withholdings in question in response to

20

Congressional inquiries and without conducting any investigation into the underlying facts regarding the hostile conditions in Iraq from 2003-2006 and the military's inability to provide the promised level of force protection. The requested findings are not tied to any particular claim or affirmative defense advanced by KBRS in this litigation. Rather, KBRS asserts that the requested findings *are* the relief to which it is entitled (FACC at 34-35). Moreover, KBRS represented to the Board at oral argument that no new findings of fact are necessary to decide its motion for summary judgment (tr. 58).

The government moves to dismiss Count XII for failure to state a claim, positing that "[a]ppellants cannot come before the Board for freestanding 'findings' unconnected to well-pleaded claims for contractual relief" (gov't mot. at 13). KBRS responds simply that the requested findings "are clearly within the scope of these appeals" and that the government has not cited to any legal authority prohibiting us from making the requested findings (app. opp'n at 30).

We have been presented with no reason why the Board should make new findings of fact unconnected to any contractual claim or defense before it. We therefore grant the government's motion to strike as to Count XII.

In conclusion, the surviving counts of KBRS's FACC are II, III, IV, VI, VII, VIII, and XI. We now turn to KBRS's motion for summary judgment.

## II.    KBRS's Motion for Summary Judgment

KBRS has moved for summary judgment on the affirmative defenses presented by Counts II (prior material breach) and VI (waiver), and the government has opposed. The standards for summary judgment before the Board are well established[15] and need little elaboration here. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288-89 (1968)).

The posture in which we are asked to decide appellant's motion differs from the usual, in that there has already been a lengthy hearing on the merits in three of these appeals. Appellant relies on the Board's findings of fact set forth in our

---

[15] Board Rule 7(c)(2) provides that the Board looks to FED. R. CIV. P. 56 for guidance in deciding motions for summary judgment.

decision in *KBRS*, 14-1 BCA ¶ 35,639, for its statement of undisputed material facts (app. mot. at 2). The government does not dispute those findings of fact and has proposed "additional material facts" drawn from the existing record in these appeals (gov't opp'n at 2-3). The parties agree that the Board need not find further facts in order to decide the motion (tr. 59).

Based on the foregoing, we find the following facts to be undisputed for purposes of the motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF APPELLANT'S MOTION FOR SUMMARY JUDGMENT

1. Contract No. DAAA09-02-D-0007 (contract or Contract 0007), awarded to KBRS on 14 December 2001 by the Army Operations Support Command, Rock Island, Illinois (hereinafter Rock Island), was a cost-plus-award-fee, indefinite-quantity, indefinite-delivery contract which was part of the Army's Logistics Civil Augmentation Program (LOGCAP) and is also referred to as the LOGCAP III contract (findings 2, 3). The contract included the FAR 52.211-15, DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS (SEP 1990) clause, which stated: "This is a rated order certified for national defense use, and the Contractor shall follow all the requirements of the Defense Priorities and Allocation Systems regulation (15 CFR 700)." The cited regulation stated in pertinent part:

### § 700.3 Priority ratings and rated orders.

(a) Rated orders are identified by a priority rating.... Rated orders take preference over all unrated orders as necessary to meet delivery dates....

(b) Persons receiving rated orders must give them preferential treatment as required by this regulation. This means a person must accept and fill a rated order for items that the person normally supplies....

(c) All rated orders must be scheduled to the extent possible to ensure delivery by the required delivery date.

....

### § 700.7 Compliance

    (a) Compliance with the provisions of this regulation...is required by the Defense Production Act.... Violators are subject to criminal penalties.

(Findings 4, 5)

    2. The contract also contained section H, Special Contract Requirements, which set forth the following clause:

### H-16 Force Protection

- While performing duties [in accordance with] the terms and conditions of the contract, the Service Theater Commander will provide force protection to contractor employees commensurate with that given to Service/Agency (e.g., Army, Navy, Air Force, Marine, DLA) civilians in the operations area unless otherwise stated in each task order.

(Finding 9)

    3. Following the invasion and occupation of Iraq in March 2003, Rock Island issued task orders under the contract for logistic and life-support services, including food service and billeting, for the coalition combat forces. Task Order (TO) 59, with an initial total ceiling price of $802,065,733, was issued effective 24 June 2003, and its successor, TO 89, was issued effective 1 May 2005 with an initial ceiling price of $4,972,882,216. Paragraph 1.10 in Change 5 to the TO 59 Statement of Work (SOW), effective 27 August 2003, stated: "The government will provide for the security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism/Force Protection guidelines." Paragraph 1.7 of the TO 89 SOW as issued on 1 May 2005 stated: "The Government will provide for the force protection and security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism/Force Protection guidelines." (Findings 11, 13)

    4. Attacks on KBRS and subcontractor supply convoys began in June 2003. KBRS warned the Rock Island PCO on 27 June 2003 that failure to provide force protection in accordance with the LOGCAP III contract would mean that KBRS and subcontractor vehicle convoys would have to be delayed, adversely affecting timely delivery of food service support. (Findings 14, 15) The Deputy Commander of the Coalition Forces Land Component Command (CFLCC) from 2003-2004,

Major General (MG) Stephen Speakes, testified that he arrived in Iraq in late June and that it was obvious to him that "we were taking new levels of threat to our supply and relief formations across Iraq." Among the options he considered for dealing with the increased threat were assigning more combat units to protect the convoys, and looking at the potential for hired contractual security. (Finding 16)

5. On 9 July 2003, KBRS met with MG Speakes and reported that the personnel and equipment casualties from attacks on its convoys and those of its subcontractors from mid-May to date were 7 killed, 7 wounded, 4 missing and 10 trucks missing. MG Speakes noted: "Tomorrow the government will provide convoy protection for 46% of the convoys waiting to travel north. This level of support must increase, but presently the government is short convoy escort vehicles and shooters (shotgun riders)." The parties discussed KBRS contracting for private security, and agreed that "LOGCAP Planners will develop a revised statement of work requesting contracted security." (Finding 19)

6. On 19 September 2003, MG Speakes sent the following message and formal request to the Rock Island Commander:

> Subject: CFLCC Request for Help with LOGCAP
> Contractor Convoy Security.
>
> [I]n message below we request your help in solving one of
> our most vexing problems, specifically convoy security for
> contracted operations in Iraq....[W]e see no other optoin
> [sic] but to ask that the current contract provisoins [sic] be
> amended to support operations in Iraq. We appreciate your
> support and hope that this is a request that is
> supportable....
>
>     ....
>
> MEMORANDUM FOR Commander, Army Field Support
> Command. Rock Island, Il 61299
>
> SUBJECT: Adequate Force Protection for the Logistics
> Civil Augmentation Program (LOGCAP) Convoys in
> Kuwait and Iraq
>
> 1. Request Army Field Support Command (AFSC) review
> the basic LOGCAP contract and provide a contractual
> recommendation allowing Kellogg Brown & Root (KBR)
> the authorization to pursue a civilian transport and

24

transportation security company to conduct convoy escorts missions for the execution of convoys in Iraq during the movement of government materiel on theater supply routes. The current force protection posture, pending reductions in force structure, present and future demands for military police forces, all support the need to explore options other than military escorts in order to conduct secure and unhindered convoy operations.

2. The LOGCAP Basic contract and Statements of Work (SOW) needs to be modified to allow for KBR to provide contract security for their convoys moving government materiel on theater supply routes in Kuwait and Iraq. This change to authorization and utilization of contracted security should be in compliance with US Federal and Military Regulations that established the current base contract.

3. The contract should be administered by KBR or its subcontractor, with standards and operating procedures in accordance with the senior military police organization in theater. The scope of operations or task execution plan will be developed by KBR and accepted through the appropriate contracting and command channels.

4. We understand that there will be legal and perception concerns in the use of contracted security, but with pending reductions in force structure, present and future demands on contractor support, we must ensure unimpeded flow of supplies. We believe this is a viable course of action.

MG Speakes expected that Rock Island would prepare a proposal for contract modification that he could submit for approval by the appropriate commanders in Iraq and at CENTCOM. However, he testified: "Despite my repeated efforts, to my knowledge I never got a formal proposal back, and I never was able to take anything and formally bring it up to a higher staff to ask for their help." (Findings 20, 21)

7. On 24 November 2003, the commander of the Defense Contract Management Agency (DCMA) activity in Kuwait, CDR Kent Caldwell, USN, sent a message to the CFLCC 143rd Transportation Command. The message cited the

conflicting standards in operation orders (OPORDS) issued by CFLCC and CJTF-7[16] for convoy protection, and further stated in pertinent part:

> As convoy security is contractually required to be provided by the government and be consistent with the standards set for all DOD civilians, I believe the government is faced with an unexecutable task. As I understand it, they are no longer resourced to comply with either standard, especially when you consider that contractors cannot carry weapons. Their need for external security is greater [than] that of armed soldiers moving in military convoys for which the majority of the guidance found in both OPORD's applies.

> ....

> While I understand and appreciate the resource restrictions on both soldiers and government equipment to perform the missions assumed by KBR under the LOGCAP III contract, the Army has entered into a contract with KBR and is apparently unable to provide the requisite security and protection requirements established by either CFLCC or CJTF-7. If uncorrected this will significantly impact the fuel, line haul, mail, and Class 1 transportation mission areas supported under this contract.

(Finding 23)

8. On 19 December 2003, CJTF-7 Fragmentary Operations Order (FRAGO) 1242, (KBR Convoy Security Procedures) stated in relevant part:

> ATTACKS AGAINST KELLOGG, BROWN AND ROOT (KBR) CONVOYS HAVE DRAMATICALLY INCREASED DURING THE MONTHS OF OCTOBER AND NOVEMBER. BASED UPON INTELLIGENCE ESTIMATES, THE THREAT OF FUTURE ATTACKS AGAINST KBR CONVOYS IS PROJECTED TO INCREASE DURING THE MONTHS OF DECEMBER 2003 THROUGH APRIL 2004....SINCE THE BEGINNING

---

[16] Combined Joint Task Force-7 (CJTF-7) was the initial designation of the coalition military forces in Iraq. On 15 May 2004, the designation was changed to Multi National Force-Iraq (MNF-I). CJTF-7 and MNF-I reported to the Theater Commander, CENTCOM. *KBRS*, 14-1 BCA ¶ 35,639 at 174,522 n.3.

OF OCTOBER, TH[E] MAJORITY OF ATTACKS AGAINST KBR CONVOYS HAVE BEEN THE RESULT OF IEDS AND SMALL ARMS FIRE. NINETY PERCENT OF ALL ATTACKS DIRECTED SPECIFICALLY AGAINST KBR CONVOYS HAVE OCCURRED ON MSR TAMPA. HOWEVER, SEGMENTS OF ASR JACKSON, MSR MICHIGAN, MSR MILTON AND MSR MOBILE REMAIN EXTREMELY DANGEROUS TO KBR CONVOYS. KBR CONVOYS REMAIN EXTREMELY VULNERABLE TO ATTACKS AT REST STOPS, REFUEL POINTS, TRAFFIC CHOKE POINTS, LOCATIONS OF VEHICLE BREAKDOWNS, HAND-OFF POINTS FOR CONVOY SECURITY ESCORTS, MSC BOUNDARY LINES...AND MOVEMENT UNDER OVERHEAD PASSES.

(Finding 24)

9. On 22 February 2004, the KBRS Deputy Area Manager for V Corps North sent the following message to the troop unit that was responsible for force protection in that area:

> For your information the military has failed to comply with providing escort requirements. Time and time again we have sent emails after emails and made phone calls after phone calls to get this escort requirement taken care of. As you know last week a convoy was arranged for four (4) trucks and they were abandoned while in route because of the speed of travel. I would like to point out this same subcontractor had employees shot in a drive by shooting yesterday around B3, so they are a marked target.
>
> It was also briefed on the last [meeting with the government] that [the government] would prefer to have at least nine (9) to ten (10) trucks in a convoy. We consulted with our subcontractor and they hired additional trucks for a total of ten (10) trucks which are loaded and ready to go, when request for convoy was acquired today, KBR was told [the government] was not able to provide the escorts due to lack of assets and would not have the assets for two to three weeks if then. This has directly affected our ability to carry out our tasked assigned to KBR by CJTF7,

27

plus is causing the subcontractor to occur [sic] unexpected costs.

The government answer to KBRS's 22 February 2004 message was that: (i) "these combat units were sent here to fight the war, not do escorts for KBR ONLY"; (ii) the tasking placed on the troop unit responsible for providing the force protection was 'enormous'; and (iii) when the troop unit was ready to resume escort duty, 'I will let you...know.'" (Findings 30, 31)

10. On 12 April 2004, CJTF-7 FRAGO 622 described the current convoy security situation as follows:

> THE ENEMY IS PROSECUTING A DELIBERATE OPERATION TO INTERDICT OUR LINES OF COMMUNICATION (LOC). WITH THE SIMULTANEOUS ATTACKS ON SIX OVERPASSES ON 10-12 APRIL 04, IT IS APPARENT THE ENEMY HAS TAKEN HIS CAMPAIGN BEYOND HARASSMENT THROUGH DIRECT ACTION TO A DELIBERATE EFFORT FOCUSED ON THEATER LOC INTERDICTION.
>
> CURRENT SITUATION. ALONG MSRS LEADING INTO AND OUT OF BAGHDAD THERE HAVE BEEN 66 ATTACKS IN THE LAST WEEK, 49 ATTACKS ONE WEEK AGO, AND 50 TWO WEEKS AGO. THERE HAVE BEEN 3 COMPLEX ATTACKS/AMBUSHES IN LAST THREE DAYS RESULTING IN THE DESTRUCTION OF A REFUELING CONVOY...DESTRUCTION OF 4 OVERPASSES...AND THE AMBUSH OF A CONVOY....THE MSRS BETWEEN 1) BAGHDAD AND BALLAD, 2) BAGHDAD AND KARBALA, AND 3) BAGHDAD AND FALLUJAH ARE EXTREMELY DANGEROUS AND CONTINUE TO BE HIGHLY SUSCEPTIBLE TO THREAT ACTIVITY RANGING FROM IEDS TO SMALL ARMS AND RPG ATTACKS/AMBUSHES.
>
> CURRENT ASSESSMENT: ATTACKS ARE MUCH HIGHER THIS WEEK AND UPWARD TREND IS LIKELY TO CONTINUE AS A RESULT OF THE CONTINUED SADR/MAHDI MILITIA UNREST, AND

OPERATIONS AGAINST THREAT FORCES IN
WESTERN IRAQ.

(Finding 32)

11. On 14 April 2004, the DCMA administrative contracting officer (ACO) for
TO 59 (MAJ Hills) reported to the Commander, DCMA Northern Iraq (LTC Blaine)
the following:

> All indications are that the government has failed to live up
> to its contractual obligation to provide Force Protection
> (FP) to the TTM convoys (TO0059). Given that, KBR is
> currently not required to run most (if any) convoy routes.
> They did run three convoys to Anaconda today. Only one
> made it. The other two got lost. They are now at an FOB.
> KBR may not run any convoys tomorrow if the
> government does not improve its track record on FP. The
> same MP escorts that got them lost are to bring the two
> convoys in to Anaconda tomorrow. The best I can tell at
> this time is that they have never ran the route they are
> about to set out on. Based on my discussions with TTM's
> PM...I went over and talked to the 13th COSCOM CC...I
> told him of KBR's concerns. I feel contractually the
> government is not living up to its contractual obligations.
> [The COSCOM Commander] stated that COSCOM was
> doing their part by providing a soldier for every third truck.
> He said it was the 15th MP's that were providing the escort
> not COSCOM and that the issue of getting lost was...not a
> FP issue "...they are all safe aren't they." I just want to go
> on record that absent any new information from the
> government, I concur with KBR in that the government is
> not providing FP commensurate with the threat. If they
> choose not to run tomorrow I would be hard pressed to
> disagree with them. Oh by the way, one of the trucks in
> one of the lost convoys got destroyed by an IED.

(Finding 33)

12. Lieutenant General (LTG) Ricardo Sanchez, commander of CJTF-7 and its
successor unit from June 2003 to July 2004, testified that there was insufficient
capacity to accomplish all the tasks that were assigned to the force on the ground in
Iraq during that period and that he did not have sufficient resources to provide the
same level of protection to KBRS that was being provided to civilians. For that

29

reason, he stated, in the "fall and early winter of 2003, we very clearly established within the command that the capacity of the force, the quantity of the force, and the demands of the mission...we were not going to be able to continue supporting that without private security." By March 2004, he testified, there were between 10 and 20 private security contractors operating in Iraq, and he believed their presence and assistance in accomplishing the mission was welcomed by commanders at the battalion and brigade level. (Findings 35, 37, 38)

13. Following termination of the Coalition Provisional Authority (CPA) and establishment of the Interim Iraq Government as the civil government of Iraq on 30 June 2004, CENTCOM issued a Warning Order (WARNORD) on 4 July 2004 entitled "CONTRACTOR RISK MITIGATION" that tasked commanders to develop courses of action (COAs) for U.S. Government contractor risk mitigation in Iraq. The WARNORD stated that MNF-1 had not to date provided protection for contractors "AS CONTRACTOR SECURITY IS NOT A SPECIFIED MILITARY MISSION," and further stated that "CONTRACTORS ARE PRIMARILY RESPONSIBLE FOR THEIR OWN SECURITY." The WARNORD concluded that "given the current security environment in Iraq, all USG agencies must coordinate protection of USG contractors through a combination of coalition military forces, Iraq security forces, and private security companies." (Finding 39)

14. From March to September 2004, attacks on KBRS subcontractor employees and vehicles continued, with 5 employees killed, 1 beaten, and 25 missing or held captive (finding 40). On 29 August 2004 KBRS notified LTC Sean O'Day, Commander of DCMA Northern Iraq, that a subcontractor convoy escorted by a private Iraqi security company had been ambushed and three trucks were missing. LTC O'Day remarked that there might be questions why private security and not a military escort was used for protection. At the hearing, he testified that security was always a big issue, and that there weren't enough military forces in Iraq to do everything that needed to be done and provide convoy security for contractors. (Findings 40, 41)

15. Craig Peterson, KBRS's Program Manager in Iraq from November 2004 to 1 April 2005, testified that although he did not have specific knowledge, KBRS subcontractors in Iraq had to be using PSCs because "[i]f they were not using PSCs, I have no idea how they did their job. None whatsoever. Because they couldn't have gone anywhere." Mr. Peterson further testified as to the availability of military protection for KBRS subcontractor convoys:

> I myself, as the head [of LOGCAP] and a retired general
> officer, would be on an installation and ask the young
> lieutenant or captain who has got a convoy going to
> Arifjan or somewhere if I could pile in. They said, "I don't

do contractors." I said, "I'm Craig Peterson. I'm in charge of LOGCAP." They said, "I don't do contractors."

Q. They didn't say, "Who?"

A. No....So, I mean, it -- if I got kicked out of convoys, then there is no doubt in my mind that subs did.

(Findings 49, 50)

16. KBRS's principal subcontractor in Iraq was Eurest Support Services Worldwide (ESS), who installed and operated military dining facilities (DFACs) at specified sites throughout Iraq and concluded its operations in Iraq on 30 June 2006. ESS's operation manager from June 2003 to June 2006 was Steven Murray. Mr. Murray testified that ESS used PSCs for the entire period of its performance in Iraq to supplement military force protection:

> [W]e pretty consistently used, from early '03 and all the way through our departure in '06, PSD [private security detachment] teams to move people and money and equipment in and out of the country, because again, even in '05 and '06, the [military] convoy system would not let our NTVs [non-tactical vehicles] in the convoy. If you disclosed you're carrying cash, you're not getting in the convoy with cash, and it was a total cash economy the whole time we were there.
>
> ....
>
> ...It became extremely difficult to move things between sites. We'd approach – we tried to use some military force protection on the site, and I personally talked to two or three commanders about this. We were told pretty consistently that the military is not there to babysit contractors.
>
> ....
>
> I had some people...stuck on a southern site, and I needed to move them to a northern site. [They were included in a government convoy but] halfway through Baghdad, they stopped our vehicle...[S]aid they got a call to go on a mission and they took off in another

31

direction.... [W]e dispatched, enormous cost,...a PSD team to go and pick them up.

.....

...Another occasion happened whereby we were moving equipment...we had two or three large 500 kV generators...at one site; we had to move them across Baghdad to another site. They [the government] agreed to move us.

...Halfway there, they told our truck to pull over and wait. They had to leave, and they left. Never saw my truck again. It was just gone. The driver,...I don't know what happened to him. The truck was gone.

We learned our lesson very quick. We did ask, from time to time, and most times it was "We're not doing that. We can't do that. We're warfighters. Take care of yourselves." It's extremely difficult to move between sites, and it was a pretty regular need of ours to do that....

Money, people, sometimes food.... [We] only carried two or three days' worth of food [at each dining facility site]. So if you don't have a delivery coming in every third day, you're in trouble. You can't feed soldiers. That was unacceptable to us, as a caterer, and to our client, KBR. We could not fail.

So we had to move food, and the military would not touch it from intra-theater. They had bigger things to do than to move contractors.

Q: Did there ever come a time when you simply gave up on seeking force protection?

A. Honestly, no. It was in our interest. I mean this is a business, and if I didn't have to pay a PSD team, which were not cheap, and I could get it in a convoy, I'd rather use a convoy. It didn't always fit with our business unfortunately.

> Either you didn't have the time to do it, or they wouldn't do it. But always, even up until middle of June of 2006, when we were leaving, we tried to use convoys as much as we could. It's a cost saver for us. So but the answer is yes. We never gave up trying to do that.

(Findings 51, 52)

17. Lack of force protection extended to static security as well as security for convoys. Mr. Murray testified that between January and June of 2006, as demobilization activities began, the military was either leaving or on their way out. Although it tried to secure military force protection, in several instances ESS was left to move people and assets out of installations that had been left completely open, and had to bring PSCs in to provide security for the compound while assets were taken down and loaded, and then used "our own guns to move those things across country." (Finding 53)

18. Most if not all of the subcontracts awarded by KBRS to perform LOGCAP III were awarded on a negotiated firm-fixed-price basis (finding 54). Asked if ESS made or lost money on its use of PSCs at the hearing, Mr. Murray testified that the use of PSCs was unequivocally a money-losing proposition. He explained that ESS proposed and negotiated a price based on an estimated use of PSCs, and that as the scope of work expanded and the security situation worsened, both the frequency of use and the cost per mission of PSCs increased far beyond the estimated amount, with the result that "[w]e incurred more costs than we charged [KBRS]." (Finding 54)

19. LTC Scott Sheridan succeeded LTC O'Day as commander of DCMA Northern Iraq in November 2004. On 22 April 2005 the award fee determination for KBRS's performance of TO 59 for the previous year was issued with a rating of "excellent" and specific note of the challenging circumstances under which that rating was earned, including "attacks on and hijacking of your convoys" and "lack of force protection to escort convoys with needed materials." LTC Sheridan briefed the award fee determination the next day, underscoring the same two special considerations–"[o]perating in a non-permissive environment" and "[a]vailability of escorts." (Findings 43-45)

20. KBRS's initial policy in Iraq was not to use private security to perform the contract because force protection was supposed to be provided by the Army (finding 46). However, KBRS senior managers did begin to use private security to be able to move around from location to location, and this was known in 2004 to both the Rock Island PCO (Mary Beth Watkins) and the DCMA Iraq commander, COL Ainsworth Mills, who expressed the opinion at the time that the PSC costs would not be allowable on the

contract (finding 47). The record contains no evidence that the government, including the PCO, did anything to stop KBRS from using PSCs (finding 48).

21. The record also shows that the government was aware that KBRS subcontractors were using PSCs to move convoys and did not object. The KBRS coordinator for all subcontractor movements from Kuwait into Iraq from mid-July 2003 until some point in 2005 was Ms. Leslie Smith, who testified that while the primary method of movement was a military escorted convoy, the Army Movement Control Battalion (MCB) routinely received and granted requests to move with private security. These requests were made expressly and in writing on the KBRS MP Escort Allocation Request submitted daily to the MCB. In addition, Ms. Smith on 24 March 2004 sent a memorandum to MAJ Grady Sessoms, the designated point of contact at the MCB, stating in part that "Private security is allowed. Iraqi security escorts wait in Iraq to hook up with their convoy." On no occasion did MAJ Sessoms or anyone else at MCB respond that private security was not allowed. (Findings 57, 58) Moreover, on 10 June 2005 a DCMA administrative contracting officer consented to the award of a food services subcontract with an express pricing justification in the consent documents referring to the expected use of PSCs to help transport maintenance personnel to their respective sites (finding 60).

22. The government offered five statements of additional material facts (GSAMF), for the purpose of demonstrating disputes of material fact preventing the grant of summary judgment on either Count II or Count VI. They are as follows.

> 1. In February 2006, Kristan Mendoza, the acting chief of the Army's LOGCAP Contracting Branch at Rock Island Arsenal Illinois, wrote to Mary Wade, KBR's LOGCAP contract manager in Houston, Texas, about a report that a KBR Tier 1 LOGCAP III subcontractor had accidentally discharged a handgun. Ms. Mendoza asked Ms. Wade, among other things, "what measures are being taken to ensure that contractor or subcontractor personnel do not possess firearms in the AO [area of operations]." The following day, Ms. Wade advised Ms. Mendoza, among other things, that "[t]he subcontractor terms and conditions state weapons are not allowed on the project," and that KBR's "policy is that no LOGCAP or subcontractor employees are allowed to carry weapons."

> 2. In July 2006, Sylvia Youngman, the chief of the Army's LOGCAP Contracting Branch at Rock Island, emailed Philip Wagner, a KBR contract administrator, seeking comments on proposed responses by the Army to

questions posed by Representative Henry Waxman about the LOGCAP III contract. Ms. Youngman proposed to tell Representative Waxman that KBR "has advised the Army that it has never directly hired a private security contractor in support of the execution of a statement of work under any LOGCAP III Task Order" and that "KBR is presently unaware of any payments to subcontractors which include[d] charges for private security costs, but [KBR] continues to look into this." When Ms. Youngman's proposed responses were circulated within KBR, Chris Heinrich, a KBR legal official, commented internally, "These answers look to be appropriate."

3. Also in July 2006, William Walter, a senior vice president of the appellant, who had been the appellant's Director of Government Compliance from 2003 to 2005, prepared a declaration for filing in *Smith v. Halliburton Co.*, No. H-06-0462 (S.D. Tex.), a tort action against the appellant and its parent company. In a draft declaration, Mr. Walter stated that "under the LOGCAP Contract [No. DAAA09-02-D-0007] and Task Order 59, KBRSI had no obligation to provide, and in fact was prohibited from providing, force protection for its employees at [Forward Operating Base] Marez [in Iraq], including security of any kind to protect KBRSI personnel in the Dining Facility ... [from] a suicide bomber."

4. "In response to Congressional inquiries about the use of PSCs by KBRS and its subcontractors..., Ms. Mendoza on 31 January 2007 obtained documentation from [KBR subcontractor Eurest Support Services (ESS)] that in March 2005, 'Security' was 12.55% of 'our labor pricing in our subcontracts[.]'"

5. In February 2007, George Seagle, an executive of the appellant, testified before the House Government Reform Committee. In response to questions from Representative Waxman, Mr. Seagle testified that KBR had "never directly subcontracted for armed security under the LOGCAP contract" and had not "required or directed any of our subcontractors to subcontract for security either."

(Gov't opp'n at 2-3)

## DECISION

The government has made a number of different arguments with respect to Count II of KBRS's FACC. The vast majority of these were made in connection with the government's motion to dismiss and have been dealt with above. In its briefing, the only two arguments the government makes specifically in opposition to KBRS's motion for summary judgment are that (1) whether a breach is material is not a determination appropriate for summary judgment, and (2) we must deny summary judgment on Count II because there is a genuine dispute of material fact with respect to the materiality of the Army's breach (gov't opp'n at 11-12). For the latter, the government offers the following: (1) KBRS did not believe at the time it submitted its claims in three of these appeals that the contract obligated the Army to protect KBRS subcontractors, meaning that KBRS entered into the LOGCAP contract "with no expectation of force protection for its subcontractors;" and (2) senior management of KBRS in 2006-2007 told the government that KBR did not allow either KBR or subcontractor personnel to carry weapons, meaning that KBR senior management, at least, did not think that the need for security was so great that the failures in force protection by the Army amounted to a total or material breach. (*Id.* at 12)

We address first the government's contention that whether a breach is material is not an issue that should be decided summarily. The government relies on two Federal Circuit cases to support this argument. The first is *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548 (Fed. Cir. 1992). *Stone Forest* is cited for the following proposition:

> Not every departure from the literal terms of a contract is sufficient to be deemed a material breach of a contract requirement, thereby allowing the nonbreaching party to cease its performance and seek appropriate remedy. The standard of materiality for the purposes of deciding whether a contract was breached "is necessarily imprecise and flexible." *Restatement (Second) of Contracts* § 241 cmt. a (1981).... The determination depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.

*Id.* at 1550-51. In *Stone Forest*, the Federal Circuit reversed the U.S. Claims Court and found that the government's denial of access to 15.89 percent of the timber originally contracted for was a material breach. *Id.* at 1552.

The second case relied on by the government is *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988), cited for the proposition that questions of contract

interpretation requiring the weighing of extrinsic evidence are not amenable to summary resolution. We think the government's reliance on this decision is misplaced. In *Beta Systems*, as in most cases where a court or board is called upon to decide motions for summary judgment, there had been no trial on the merits. In this case, there was an extensive hearing on the merits and testimony from numerous government and contractor witnesses bearing on how the LOGCAP contract and task orders were viewed, bargained for, entered into, and performed by the parties, as well as detailed factual findings made by the Board on the basis of that record. Any judgment rendered on this record is not truly "summary." At oral argument the government appeared to back off the position taken in its briefs, agreeing that the Board's original findings plus the government's additional material facts were a sufficient basis for the Board to rule on the motion for summary judgment (tr. 59).

Next, we turn to the government's argument that KBRS's claims underlying ASBCA Nos. 56358, 57151, and 57327 show that KBRS had no expectation under the contract that the Army would provide force protection to any of its subcontractors, precluding summary judgment at least with respect to the subcontractor PSC costs at issue (gov't opp'n at 12). For this proposition, the government cites to KBRS's certified claims of 22 October 2007 (ex. G-1) and 16 June 2010 (ex. G-3) for sums withheld by the Army to recover allegedly unallowable PSC costs incurred by its subcontractors. It is true that in these claims, KBRS argued that the contract required the Army to provide force protection to KBRS employees but did not require the Army to provide force protection to subcontractor employees (ex. G-1 at 10-12, ex. G-3 at 13-15). However, these arguments must be viewed in context. KBRS presented this argument as one of many reasons why the Army's disallowance of subcontractor PSC costs under Clause H-16 was improper: if the contract did not obligate the Army to provide force protection to subcontractors, then it could not be reasonably read to prevent those same subcontractors from providing for their own force protection, when the Army did not provide it, and billing the cost of same as a reasonable cost of contract performance.

The undisputed facts show that *at the time the contract was being performed,* both KBRS and government personnel believed the government was obligated under the contract to provide force protection to both KBRS and its subcontractors (*see* SOF ¶ 4 (KBRS warned the Rock Island PCO on 27 June 2003 that failure to provide force protection adequate to the threat in accordance with the LOGCAP III contract would mean that KBR and subcontractor vehicle convoys would have to be delayed, adversely affecting timely delivery of food service support); SOF ¶ 7 (the commander of DCMA in Kuwait expressed concern in November 2003 that the government would be unable to meet its contractual obligation to provide security and protection for KBRS convoys); SOF ¶ 9 (KBRS manager sent a message in February 2004 to the troop unit responsible for force protection, saying that "the military has failed to comply with providing escort requirements" and citing (1) the abandonment of a subcontractor convoy while en route and (2) the assembly of a

subcontractor convoy of 10 trucks loaded and ready to go only to be told no military escort was available and might not be available for weeks); SOF ¶ 11 (the DCMA ACO for TO 59 stated to the commander of DCMA Northern Iraq in April 2004 that "[a]ll indications are that the government has failed to live up to its contractual obligation to provide Force Protection...to the [TO 59] convoys.... Given that, KBR is currently not required to run most (if any) convoy routes.")). The government has cited to no statement by either KBRS or the government contemporaneous with contract performance that would support the assertion that KBRS "viewed, bargained for, entered into, and performed" the LOGCAP III contract "with no expectation of force protection for its subcontractors." Therefore, its argument that the Army's failures to provide force protection to KBRS subcontractors was not a material breach, because there was no expectation that force protection would be provided, is unpersuasive.

Finally, the government asserts that there is a dispute of material fact with respect to how important government force protection was to KBR itself, given "[t]he persistence of KBR's official no-weapons policy throughout the claim period" (gov't opp'n at 12). For this, the government cites to GSAMF paragraphs 1, 2, and 5. GSAMF 1 deals only with employee possession of private weapons, which KBRS did prohibit, but not with PSCs, which is how KBRS provided security to its employees in Iraq when military force protection was not available. GSAMFs 2 and 5 both deal with accurate statements by KBRS officials that KBRS did not hire a PSC directly in support of LOGCAP III. The cost of PSCs hired to protect top KBR officials traveling in the Middle East was incurred by a KBRS office servicing a number of KBRS contracts in the Middle East, including LOGCAP III, and was allocated to those contracts as an indirect cost. *KBRS*, 14-1 BCA ¶ 35,639 at 174,514. The government has failed to raise any genuine issue of material fact regarding the importance of force protection to KBRS under LOGCAP III.

The undisputed facts establish that the government committed the first material breach under the contract. The invasion and occupation of Iraq occurred in March 2003. Attacks on convoys began in June 2003, and by 27 June 2003 KBRS was already warning that the government was not providing force protection in accordance with its contractual obligation. (SOF ¶¶ 3-4) MG Speakes, the deputy commander of Coalition land forces in Iraq, quickly assessed that increased force protection was necessary and requested that the commander at Rock Island have the LOGCAP III contract amended to allow for use of private security for convoys moving materiel in Iraq. However, that never happened. (SOF ¶¶ 4-6) In November 2003, the commander of DCMA in Kuwait warned that the government was "faced with an unexecutable task" to provide force protection to convoys in accordance with applicable standards (SOF ¶ 7). In response to a KBRS message in February 2004 that neither it nor its subcontractors were receiving the promised protection, the responsible military unit replied that "these combat units were sent here

38

to fight the war, not do escorts for KBR ONLY" (SOF ¶ 9). The DCMA ACO stated in April 2004 in no uncertain terms that the government had failed to live up to its contractual obligation to provide force protection to the convoys (SOF ¶ 11). Several witnesses testified that by spring and summer of 2004 it was evident that the force on the ground was insufficient to accomplish military missions and provide security for contractors. The need for PSCs to supplement Coalition and Iraqi forces to provide security to contractors was widely recognized (SOF ¶¶ 12-14).

The government does not seriously dispute that it was obligated under the LOGCAP III contract to provide force protection to KBRS and its subcontractors equivalent to that provided to DoD civilians, and obligated under TOs 59 and 89 to provide them with force protection commensurate with the threat. Indeed, it would be unconscionable to take the position that the contract prohibited KBRS and its subcontractors from providing for their own protection, while performing in a war zone, without otherwise providing for their security. Yet, despite the many and continuing failures of the government to provide the promised level of force protection to KBRS and its subcontractors summarized above, the government seeks to disallow the PSC costs incurred by KBRS and its subcontractors in order to accomplish their mission under the LOGCAP contract despite the government's breach, and argues that its breach was not material. It is hard to imagine a contract breach more material than this one, which eviscerated the promise at the heart of the justification for the government's claim. The government's breach was material.

One of the grounds for the government's motion to dismiss Count II is that KBRS waived the material breach by continuing to perform the contract. We previously rejected this argument as a basis for dismissing Count II for failure to state a claim for relief, stating that the record in these appeals amply demonstrated that KBRS and its subcontractors made a commercially reasonable decision to continue to perform the contract with PSC protection rather than abandon performance in response to the government's breach, and citing the decision of the Court of Claims finding that continued performance did not waive the government's material breach in *Northern Helex*, 197 Ct. Cl. 118, 129. We also found that this case presents the same sort of "special aspect" present in *Northern Helex*, i.e., that the contractor's continued performance was consistent with the purpose of the contract and in the national interest. It is unclear to us whether the government also asserts this ground in opposition to summary judgment, but to the extent that it does, we hold that KBRS and its subcontractors did not waive the government's prior material breach by continuing to perform.

What remains is the question of the appropriate remedy for the government's material breach. KBRS has raised prior material breach as a defense to the government's claim of breach embodied in its claim for unallowable costs. Our appellate precedent recognizes that a party may defend a claim of breach on the

ground that a legal excuse for its nonperformance existed at the time of the alleged breach. *Long Island Savings Bank*, 503 F.3d at 1251 (plaintiffs' claim for damages precluded by their prior breach–submitting a false certification). In *Laguna*, 828 F.3d at 1372-73, the Federal Circuit affirmed this Board's grant of summary judgment to the government, holding that a contractor's claim for unpaid costs of performing an environmental remediation and construction contract in Iraq was precluded by the contractor's prior material breach–violation of the contract's Allowable Cost & Payment clause.

In these appeals, the government has claimed and withheld from payment to KBRS the amounts it believes it previously paid in unallowable PSC costs. The basis for the government's claim of unallowability is that the costs were incurred in violation of the contract's prohibition against the use of PSCs. Because the record in these appeals establishes that the claimed PSC costs were reasonable in amount and were incurred only when necessitated by the government's failure to provide the contractually promised level of force protection to KBRS and its subcontractors, the government's prior material breach operates to excuse any subsequent noncompliance with the contract's PSC prohibition. Thus, the government's claims for unallowable PSC costs are precluded in their entirety and we grant summary judgment for KBRS on Count II of its FACC.

## CONCLUSION

The government's motion to dismiss is granted as to Counts I, V, and X, and those affirmative defenses are stricken from KBRS's FACC. The motion to dismiss is denied as to Counts II, III, IV, VI, VII, and VIII. We grant summary judgment to the government on Count IX. The government's motion is denied without prejudice as to Count XI, and granted as to Count XII.

We grant KBRS's motion for summary judgment on Count II of its FACC. Having done so, we deem it unnecessary to decide whether KBRS is also entitled to summary judgment on Count VI of its FACC. The consolidated appeals are sustained in the amount of $44,059,024.49, with Contract Disputes Act interest as follows: on $19,652,815 from 22 October 2007, on $21,131,743 from 20 October 2009, and on $3,274,466.49 from 16 June 2010.

Dated: 8 June 2017

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

40

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 56358, 57151, 57327, 58583, Appeals of Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

41